**UNITED STATES of America,**
**Plaintiff–Appellant,**

**v.**

**RURAL ELECTRIC CONVENIENCE**
**COOPERATIVE CO.,**
**Defendant–Appellee.**

**No. 90–1516.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 19, 1990.

Decided Jan. 15, 1991.

Rehearing Denied March 15, 1991.

430

J. William Roberts, U.S. Atty., Office of the United States Attorney, Springfield, Ill., J. Christopher Kohn, W. Michael Tupman, Department of Justice, Civil Div., Michael W. Kelly, General Counsel, Helen Wyskoczka, Department of Agriculture, Office of the General Counsel, Washington, D.C., for plaintiff-appellant.

Frank K. Heap, Daniel Lawler, John W. Rotunno, Bell, Boyd & Lloyd, Chicago, Ill., for defendant-appellee.

Before FLAUM, EASTERBROOK and KANNE, Circuit Judges.

FLAUM, Circuit Judge.

The United States Rural Electrification Administration (REA) brought suit in district court seeking a preliminary injunction to enjoin state court declaratory judgment proceedings involving two rural electric cooperatives to which it had loaned money. The REA argued that because the state court action implicated significant federal interests, the district court should enjoin the state proceeding in favor of a parallel federal proceeding that the REA had initiated, in which all parties to the state court proceeding had been joined. The district court denied the REA's request for an injunction, and the REA now appeals. We vacate the district court's decision and remand for further proceedings consistent with this opinion.

## I.

The REA is a United States government agency that makes and guarantees loans to electrification cooperatives set up to furnish electric power to rural areas. It provides financing to generation and transmission cooperatives ("G & Ts") that generate and sell electrical power, as well as to their member[1] distribution cooperatives that purchase power from the G & Ts and distribute it to commercial and residential consumers.

The relationship between G & Ts, distribution cooperatives, and the REA is structured through an instrument known as a wholesale power contract. The contract obligates a member distribution cooperative to purchase all of its electric power over a fixed term from a G & T. When lending money to G & Ts, the REA requires that they enter into wholesale power contracts with member distribution cooperatives; conversely, when lending money to distribution cooperatives, the REA requires them to enter into similar contracts with G & Ts. This arrangement ensures that G & Ts will be able to earn revenue from the sale of power sufficient to repay their REA

1. "Members" are shareholders in the parlance of    cooperatives.

loans. In addition to taking security interests in the physical assets of both types of cooperatives, the REA takes security interests in the respective rights and interests of each party under the wholesale power contracts.

Since 1957, the REA has been loaning money for the construction of electric power distribution systems to defendant-appellee Rural Electric Convenience Cooperative (RECC), a distribution cooperative operating in Illinois.[2] As of August 1989, RECC owed the REA nearly seven million dollars in principal. As security for this debt, RECC executed a supplemental mortgage in 1974 that amended its original loan agreement with REA and gave REA a security interest in "[a]ll right, title and interest of [RECC] in ... any and all contracts heretofore or hereafter executed by and between [RECC] and any person, firm or corporation providing for the purchase, sale or exchange of electric power...." The mortgage also requires REA's approval in writing before RECC can enter into or amend any contract for the purchase of electric power.

In 1963, with the REA's approval, RECC entered into a wholesale power contract with the Western Illinois Power Cooperative (WIPCO), a generation and transmission cooperative. As amended, the contract's terms extend until 2017. Seven distribution cooperatives (including RECC) located in west-central Illinois were members of WIPCO and each purchased electric power from WIPCO pursuant to wholesale power contracts. WIPCO's fourteen-member board of directors consisted of two members from each of the seven distribution cooperatives. WIPCO was also the recipient of REA loans and guarantees for the construction of electric generating and transmission systems.

In 1989, WIPCO defaulted on its REA-guaranteed loans. As a condition for restructuring WIPCO's debt, the REA required the cooperative to merge with Soyland, a financially healthier G & T that was also a recipient of REA financing. The boards of directors and majorities of both Soyland and WIPCO agreed to the merger, and in March 1989, the entities merged, leaving Soyland as the surviving corporation. As a result of the merger, Soyland succeeded to all of WIPCO's rights under WIPCO's wholesale power contract with RECC, and became liable for all of WIPCO's debts and obligations to the REA.

RECC, a member of WIPCO, refused to acquiesce to the WIPCO–Soyland merger. On April 19, 1989, one month after the merger, RECC submitted to Soyland a written objection to the merger and demanded that Soyland purchase its membership in WIPCO pursuant to the dissenter's rights provision of the Illinois Merger and Consolidation Act, Ill. Rev. Stat. ch. 32, ¶ 188i (1989) ("IMCA").[3] Since it made this objection, RECC has made only partial payments to Soyland under their power contract. In June, 1989, RECC filed suit against Soyland in Illinois state court seeking a declaratory judgment that its obligations under the RECC–WIPCO/Soyland wholesale power contract were excused under IMCA's dissenter's rights provisions.

In response to RECC's suit, the United States, Soyland, and CFC filed suit for declaratory judgment against RECC in district court on October 2, 1989. These parties contended that the RECC–Soyland wholesale power contract was valid and binding, that RECC was in violation of its mortgage with REA, and that the RECC had unlawfully repudiated the wholesale power contract without REA's written consent in violation of section 7 of the Rural

---

**2.** The National Rural Utilities Cooperative Finance Corporation (CFC), a private lender and party plaintiff in the federal litigation, has also extended loans to RECC, but will not be further discussed as it is not relevant to our analysis.

**3.** *See* Ill.Rev.Stat., ch. 32, ¶ 188i (1989). Section 188i provides that in the event of a merger of

two not-for-profit corporations, the acquiring corporation shall be obligated to purchase from any dissenting member of the acquired corporation "such memberships or other evidence of ownership interest, together with all rights and interest thereby represented ... at a price equal to the fair value of such units of interest...."

Electrification Act.[4] In an effort to shut down the competing state court proceeding, the United States moved for a preliminary injunction barring further prosecution of RECC's state court action. The government invoked *Leiter Minerals v. United States*, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267 (1957), where the Supreme Court held that the Anti–Injunction Act, 28 U.S.C. § 2283, which generally prohibits the federal courts from enjoining state court proceedings, does not apply to injunctions sought by the United States. In *Leiter*, the Court held that the "superior federal interests" present in that case warranted the issuance of an injunction against state quiet title proceedings involving land owned by the United States so that a parallel federal proceeding initiated by the United States could go forward and possible inconsistent state and federal judgments could be avoided. 352 U.S. at 226–28, 77 S.Ct. at 291. Citing *Leiter* as support, the United States argued in district court that the federal interests in the REA's nationwide rural electrification program entitled it to have its dispute with the RECC adjudicated exclusively in a federal forum. The government contends that "because all of the interested parties were present in federal court—in contrast to state court, in which the Government was not and could not be made a party [due to the doctrine of sovereign immunity]—the federal court was the only forum in which all of the issues could be finally resolved." Government's Brief at 6.

The district court denied the motion for preliminary injunction. The court found that the government had not shown that, absent injunctive relief, an adverse state court judgment would irreparably harm the United States and held that the mere possibility of inconsistent state and federal court judgments did not constitute irreparable harm. The court also concluded that sovereign immunity did not bar the United States from intervening in the state court proceeding to protect its interests, and thus, the government possessed an ade-

quate remedy at law that precluded the award of equitable relief.

## II.

We review rulings on motions for preliminary injunctions under a bifurcated standard: factual determinations made by the district court are examined under an abuse of discretion standard, *Daryl H. v. Coler*, 801 F.2d 893, 897 (7th Cir.1986), whereas the district court's conclusions of law are reviewed *de novo, Thornton v. Barnes*, 890 F.2d 1380, 1385 (7th Cir.1989). The award of injunctive relief is appropriate in those cases where the moving party can demonstrate that (1) no adequate remedy at law exists; (2) it will suffer irreparable harm absent injunctive relief; (3) the irreparable harm suffered in the absence of injunctive relief outweighs the irreparable harm respondent will suffer if the injunction is granted; (4) the moving party has a reasonable likelihood of prevailing on the merits; and (5) the injunction will not harm the public interest. *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1014–15 (7th Cir.1990); *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988). In order to prevail, the moving party must satisfy each element of this five part test. *Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 386–87 (7th Cir.1984).

It is well settled that the availability of an adequate remedy at law renders injunctive relief inappropriate. *See Northern California Power Agency v. Grace Geothermal Corp.*, 469 U.S. 1306, 1306, 105 S.Ct. 459, 459, 83 L.Ed.2d 388 (1984) (Rehnquist, Circuit Justice) ("A party seeking an injunction from a federal court must invariably show that it does not have an adequate remedy at law."); *Beacon Theatres v. Westover*, 359 U.S. 500, 509, 79 S.Ct. 948, 956, 3 L.Ed.2d 988 (1959) ("in the federal courts equity has always acted only when legal remedies were inadequate.");

---

**4.** Section 7, 7 U.S.C. § 907, states that no REA borrower may, without approval of the REA Administrator, "sell or dispose of its property rights or franchises acquired under the provisions of this chapter, until any loan obtained from the [REA] ... shall have been repaid."

*Hillsborough v. Cromwell*, 326 U.S. 620, 622, 66 S.Ct. 445, 447, 90 L.Ed. 358 (1946) ("Where the remedy at law is 'plain, adequate and complete,' it is the one which must be pursued even for the protection of any federal right."); *Scruggs v. Moellering*, 870 F.2d 376, 378 (7th Cir.1989); *Stewart v. General Motors Corp.*, 756 F.2d 1285, 1291 (7th Cir.1985). We agree with the district court that *if* the United States were able to intervene in the state court proceeding, it would have an adequate remedy at law that precludes the award of equitable relief.[5] *See, e.g., State of Georgia v. City of Chattanooga*, 264 U.S. 472, 483–84, 44 S.Ct. 369, 371, 68 L.Ed. 796 (1924) (a party's ability to assert its claims as a defense in another proceeding constitutes an adequate remedy at law); *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 490 (7th Cir.1984) (same); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2944 (1977). Illinois law provides that "[a]n intervenor shall have all the rights of an original party...." Ill.Rev.Stat. ch. 110, ¶ 2–408(f) (1989). As an intervenor, the REA would have the opportunity to assert its federal interests and argue that RECC should not be permitted to vitiate its power contract with Soyland. Illinois law permits intervention "when the representation of the applicant's interest by existing parties is or may be inadequate and the applicant will or may be bound by an order or judgment in the action" and "when the applicant is so situated as to be adversely affected by a distribution or other disposition of property ... subject to the control or disposition of the court...." *Id.*[6]

The United States maintains, however, that the doctrine of sovereign immunity prevents it from intervening in the state court action. It observes that "[i]f it were a party to RECC's state court action, the Government's position would necessarily be defensive because RECC seeks to repudiate a contract in which the United States has a secured interest." Government's Brief at 23. The United States contends that absent express congressional authorization, the doctrine of sovereign immunity precludes the government from "subject[ing] itself in a defensive position to the jurisdiction of a state court." *Id.* at 24.

Sovereign immunity bars those suits that are "prosecuted against the United States." *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 412, 5 L.Ed. 257 (1821). Whether or not a suit is against the sovereign depends upon whether the government is " 'the real, substantial party in interest,' " in the pertinent litigation. *Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984) (quoting *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)); *see also Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 1052, 10 L.Ed.2d 191 (1963) (per curiam).

> The general rule is that a suit is against the sovereign if 'the judgment would expend itself on the public treasury or domain, or interfere with public administration,' *Land v. Dollar*, 330 U.S. 731, 738 [67 S.Ct. 1009, 1012, 91 L.Ed. 1209] (1947), or if the effect of the judgment would be 'to restrain the Government from acting or compel it to act.' *Larson v. Domestic & Foreign Corp.* [337 U.S. 682,] 704 [69 S.Ct. 1457, 1468, 93 L.Ed. 1628 (1949) ]; *Ex parte New York*, 256 U.S. 490, 502 [41 S.Ct. 588, 591, 65 L.Ed. 1057] (1921).

*Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963).

---

5. The dissent states that we "ought not apply the common law standards that make it hard for private plaintiffs to obtain injunctive relief" in cases involving public rights. The suggestion is that we should not be concerned with the availability of an adequate remedy at law. The government has not made such an expansive argument; it accepts that it must demonstrate the unavailability of an adequate remedy at law. Neither do the cases cited by the dissent support its blanket proposition. None are common law equity cases; rather, they all involve suits for injunctions brought directly under federal statutes that mandate less burdensome standards for the grant of injunctive relief.

6. If the REA's attempt to intervene in state court is rebuffed, it would be free to re-apply to the federal courts for an injunction of the state proceedings.

The district court's opinion and the record as currently developed do not make clear whether the government can be considered a "real, substantial party in interest" in RECC's state court suit and thus whether sovereign immunity should bar the United States from intervening in the state court proceedings. If the government may intervene, the injunction should be denied; if, however, sovereign immunity bars the government's participation, then, as we explain below, the district court should issue the injunction, as the other prerequisites to the grant of injunctive relief have been met. We therefore remand to the district court for a new determination of whether sovereign immunity precludes the government's intervention in the state court suit. To aid the district court in its negotiation of the sovereign immunity landscape, we offer the following analysis.

### A.

■ The overarching principle we glean from the Supreme Court's sovereign immunity jurisprudence is that the jurisdictional bar operates when a suit threatens to impose upon the United States liability for money or property damages or some form of coercive injunctive relief. *See Larson,* 337 U.S. at 687, 69 S.Ct. at 1460 (sovereign immunity bars suits that "require action by the sovereign or disturb the sovereign's property"). For example, in *Land v. Dollar,* cited above, sovereign immunity barred the plaintiff's claim that his property was being unlawfully held by the United States. In *Larson,* plaintiff attempted to enjoin the War Assets Administrator from selling a shipment of coal to another prospective buyer on the ground that the coal had been contractually promised to him. And in *Dugan,* the Supreme Court held that sovereign immunity barred plaintiff's attempt to enjoin the United States from impounding water behind a dam pursuant to Congress' express authorization.

Money damages against the United States are not at stake in RECC's state court suit. Neither is coercive injunctive relief. The government contends, however, that "a proceeding against property in which the United States has an *interest* is a suit against the United States." Government's Brief at 23, (quoting *United States v. Alabama,* 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941) (emphasis added)). It argues that under this broad formulation, REA's security interest in the RECC–Soyland contract transforms RECC's declaratory judgment action to void the contract into a suit against the United States and bars the government's *intervention.*

Before addressing the merits of the government's position, we pause first to lay bare its clear and unavoidable implication. If RECC's state court suit is effectively a "suit against the United States" because of the REA's security interest in the wholesale power contract, then whether or not the government intervenes is irrelevant: the REA's security interest remains equally threatened by RECC's state court action either way. Thus, although the government seems to contend that sovereign immunity only precludes its intervention in state court, the logical import of its argument is that *any* suit implicating a security interest held by the United States is *inescapably* a suit against the United States that should be barred by sovereign immunity. Were we to credit this argument, we would be compelled to find that. even as currently configured, (*i.e.,* without the government's participation), RECC's state court suit is a suit against the United States that ought to be barred by sovereign immunity.

■ We proceed to address the argument that because "a proceeding against property in which the United States has an interest is a suit against the United States," 313 U.S. at 274, 61 S.Ct. at 1011, RECC's state court suit implicates the sovereign immunity doctrine. Although Chief Justice Hughes indeed referred to property "interests" triggering the sovereign immunity bar in *United States v. Alabama,* the interests at issue in that case were *ownership* interests. We believe it would be inappropriate to loose the Court's statement from these factual moorings and read it as a categorical endorsement of the proposition that any proceeding that might pos-

sibly affect a government security interest necessarily implicates sovereign immunity. In *Alabama,* the Court held that sovereign immunity barred the Alabama courts from assuming jurisdiction over a state tax sale of land owned by the United States. Similarly, in *Leiter Minerals,* the government's linchpin case, plaintiffs asserted mineral rights claims to land owned by the United States. As the Court pointed out, the United States could not have been made a defendant in the state proceeding in *Leiter* because an adverse judgment would have divested it of its ownership rights.[7] We are unwilling to read these cases, all of which involve property owned by the United States, to extend categorically to all proceedings in which the United States has some legal interest in property, however attenuated this interest may be. *See Florida Dep't of State v. Treasure Salvors,* 458 U.S. 670, 698, 102 S.Ct. 3304, 3321, 73 L.Ed.2d 1057 (1982) (Suit seeking arrest of property claimed by the State of Florida not barred by the Eleventh Amendment as it did not "seek any attachment of state funds and would impose no burden on the state treasury");[8] *Olney Savings & Loan Ass'n v. Trinity Banc Savings Ass'n,* 885 F.2d 266, 274 (5th Cir.1989) (sovereign immunity bar is not triggered by damage claim against savings and loan that has been taken over by the FSLIC); *Bodimetric Health Servs. v. Aetna Life and Casualty,* 706 F.Supp 619, 624–625 (N.D.Ill. 1989), *aff'd,* 903 F.2d 480 (7th Cir.1990) (suit against private insurer acting as fiscal intermediary for Medicare program that the government has promised to indemnify is not barred by sovereign immunity).

The ramifications of the government's proposed sovereign immunity theory are indeed striking. The government's reading would enable it to employ sovereign immunity and the *Leiter* doctrine, in the absence of statutory removal authority, as a lever with which to remove to federal court a wide variety of state common law proceedings involving, perhaps only tangentially, the recipients of federal loan guarantees. The government's position would open the door to the total federalization of state actions involving, for example, the recipients of student loans with federal guarantees, or FHA–guaranteed mortgage holders. Consider a physician with $100,000 in federally guaranteed student loans. She is sued for malpractice, and the potential liability threatens to bankrupt her. May the government preempt the state tort action by filing a parallel declaratory judgment action in federal court (assuming federal jurisdiction) and moving to enjoin the state court proceedings on the ground that the government's interests in not making good on its guarantee are threatened by the state court suit and sovereign immunity thus bars the prosecution of the state action? To be sure, the government is unlikely to adopt such a litigation strategy. Nevertheless, we are wary of expanding the sweep of sovereign immunity to a degree that would allow and perhaps encourage such manipulation.

Even more troubling is the prospect that the government and private parties aligned with it could deploy sovereign immunity not merely to federalize state proceedings, but to extinguish the ability of private parties to litigate their state claims altogether. If a suit implicating a government security interest is a suit against the United States, then, as we suggest above, the action

---

**7.** In *Minnesota v. United States,* 305 U.S. 382, 386, 59 S.Ct. 292, 294, 83 L.Ed. 235 (1939), the Supreme Court again had occasion to assert that "a proceeding against property in which the United States has an interest is a suit against the United States." But again, like *Alabama* and *Leiter, Minnesota* involved property owned by the United States.

**8.** The Court in *Treasure Salvors* cited *Edelman v. Jordan,* 415 U.S. 651, 666–68, 94 S.Ct. 1347, 1357–58, 39 L.Ed.2d 662 (1974) in support of this proposition. *Edelman* held that the eleventh amendment does not preclude the award

of equitable relief with significant fiscal impact on the state treasury if that impact is an ancillary effect of an otherwise prospective court decree. *See also Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). Here too, it could be argued that the declaratory relief requested of the state court by RECC is prospective in nature, seeking to extinguish future rights and obligations under the wholesale power contract, and that the government's loss of its security interest is ancillary to the award of that relief.

should not be allowed to go forward, whether or not the United States intervenes. What would happen if, after causing the dismissal of a state court suit on sovereign immunity grounds, the government and/or private parties aligned with it did not initiate a parallel action in federal court as they did here? Because the state court suit could not go forward under the government's theory, and because sovereign immunity would also bar the state court plaintiff's initiation of an action in federal court, the state court plaintiff would be left without any forum in which to assert its claims. Accepting the government's sovereign immunity theory would thus not only result in the federalization of state law claims, but would vest the government with the power to extinguish them entirely, even in cases where the government's interest in the litigation is marginal, and neither coercive injunctive relief nor discernible monetary damages are at stake. We find this result more than a little disquieting, and are reluctant to presume that it is required by our sovereign immunity jurisprudence. When the Supreme Court wrote in *United States v. Alabama* fifty years ago that a proceeding implicating a government property interest constituted a proceeding against the United States, it did so at a time when the government's extension of loans and loan guarantees to promote federal programs was considerably less pervasive a feature of our national economy than it is today. We believe that the Court was primarily concerned with the government's ownership interests in the cases before it and did not contemplate the consequences we face here and now. The practical costs of reading Chief Justice Hughes' statement in so expansive a fashion—costs to our federal system, to the rights of private parties, and to the fluidity of commercial relations—counsel against adoption of the government's position.

### B.

We conclude that neither Supreme Court precedent nor sound public policy considerations direct acceptance of the government's argument that a suit implicating a government security interest is categorically a suit against the United States that should be barred by sovereign immunity. That is *not* to say that a suit implicating a government security interest will never trigger the sovereign immunity bar. Rather, as we suggested earlier, the question to be determined in each case is whether the government's interest are such as to make it a "real, substantial party in interest" in the litigation. *See Mine Safety Appliances Co. v. Forrestal*, 326 U.S. 371, 374, 66 S.Ct. 219, 221, 90 L.Ed. 140 (1945) ("[t]he government's interest must be determined in each case 'by the essential nature and effect of the proceeding as it appears from the entire record' ") (quoting *Ex parte New York*, 256 U.S. 490, 500, 41 S.Ct. 588, 590, 65 L.Ed. 1057 (1921)).

In determining whether sovereign immunity barred the United States from intervening in the state court proceeding in this case, the district court did not specifically examine the potential effect of the state court suit on the government's fisc or its regulatory program. Rather, it cited to *United States v. Bank of New York & Trust Co.*, 296 U.S. 463, 56 S.Ct. 343, 80 L.Ed. 331 (1936), for the proposition that the government's *intervention*—as opposed to its joinder as a party defendant— is not barred by sovereign immunity. As we explained earlier, however, whether or not the government intervenes, its security interest may be threatened. The district court, then, cannot rely on *Bank of New York* and must directly address the potential effect of the state court suit on the United States.

We remain unsure of this suit's impact on the REA. It must be determined to what extent the potential extinguishment of the wholesale power contract and the government's security interest threatens the ability of RECC and Soyland to service their debt to the REA so as to cause a loss to the government treasury. Similarly, it is unclear whether an adverse judgment will otherwise impair the REA's regulatory mandate as might a coercive injunction. How speculative are these potential effects? These are the questions the district

court must address in determining whether the United States is a real and substantial party in interest in RECC's state court suit.

## III.

The United States argues that even if it is not precluded by sovereign immunity from intervening in state court, it should not be required to do so. Invoking 28 U.S.C. § 1345, the government contends that if we deny its petition for injunction, we will be putting it to a " 'Hobson's choice' of giving up a fundamental jurisdictional right, as the Government has in this case to be in federal court, 'or waiving its right not to have a case proceed without it.' " Government's Brief at 26–27 (quoting *Wichita & Affiliated Tribes of Oklahoma v. Hodel,* 788 F.2d 765, 776 (D.C.Cir.1986)). To be sure, 28 U.S.C. § 1345 entitles the United States to *initiate* actions in the federal courts. But the government here is not merely asserting its right to a federal forum. It is asserting, rather, a right to an *exclusive* federal forum. Section 1345 does not, however, provide the government with jurisdictional carte blanche to remove any and all cases in which the government has some interest. While the government may *initiate* actions in the federal courts, it possesses a "jurisdictional right" to an exclusive federal forum in cases which it has not initiated only when Congress has provided one, *see, e.g.,* 28 U.S.C. §§ 1441–1442, or when the federal courts in the exercise of their equity powers deem it appropriate to enjoin parallel state proceedings. To contend that the United States has a "right" to an exclusive federal forum in the absence of statutory removal authority begs the question whether the federal courts should invoke the *Leiter* doctrine in this case.

Thus, even if the district court were to deny the government's request for an injunction upon remand, it would not be detracting from the government's legitimate jurisdictional prerogative under § 1345. Nor would the United States be legally compelled to intervene in RECC's state court proceeding. At the same time, the government would not be barred from both asserting its right to a federal forum *and* intervening in the state court proceeding. We hold only that if intervention is an available option—if the government has an adequate remedy at law—its request for injunctive relief should be denied.

Notions of comity further support our belief that an injunction would be inappropriate should the district court find that the United States is not barred from intervening in the state court proceedings. One critical question likely to be considered in the resolution of this dispute is whether the Illinois Merger and Consolidation Act, as applied to the WIPCO–Soyland merger, conflicts with the Rural Electrification Act and must give way in accordance with the Supremacy Clause.[9] As Justice Frankfurter wrote in *Leiter,* the federal courts must be mindful to defer appropriately to state courts when interpreting state law even when significant federal interests are at stake:

> [W]here questions of constitutionality are involved—and the Government contends that an application of the state statute adverse to its interests would be unconstitutional—our rule has been precisely the opposite: 'as questions of federal constitutional power have become more and more intertwined with prelimi-

9. We agree with the dissent that federal law likely governs the validity of the power contract. Section 7 of the Rural Electrification Act, *see supra* note 4, arguably prohibits RECC from invalidating the contract without the REA Administrator's approval and preempts the operation of IMCA, to the extent that the two statutory schemes are in conflict. State courts, of course, commonly exercise their legitimate authority to rule on such preemption questions and their decisions may be reviewed for error by the Supreme Court. *See, e.g., Ingersoll–Rand Co. v. McClendon,* — U.S. —, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *United Steelworkers of America v. Rawson,* — U.S. —, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990); *Northwest Central Pipeline Corp. v. State Corporation Commission of Kansas,* 489 U.S. 493, 109 S.Ct. 1262, 103 L.Ed.2d 509 (1989); *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987).

nary doubts about local law,[10] we have insisted that federal courts do not decide questions of constitutionality on the basis of preliminary guesses regarding local law.'

352 U.S. at 228–29, 77 S.Ct. at 292 (citations omitted). Thus, in *Leiter,* notwithstanding the presence of a "superior federal interest," the Court directed that the relevant state law question be certified to the state courts for an advisory opinion. The reasons for such deference are well established. If RECC's state court action comes to judgment first, state court interpretation of the IMCA may render adjudication of any federal constitutional question unnecessary, a result the federal courts prefer. *See Colorado River Water Conservation District v. United States,* 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (deference to state court adjudications is appropriate " 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law.' ") (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 189, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)).

In *Bank of New York,* the Court commented on the government's desire to have what it considered the more sympathetic court—the federal court—pass on the claims at issue. Chief Justice Hughes wrote that "[u]pon the state courts, equally with the courts of the Union, rests the obligation [and, by implication, capability] to guard and enforce every right secured by the Constitution and laws of the United States whenever those rights are involved in any suit or proceeding before them." *Bank of New York,* 296 U.S. at 479, 56 S.Ct. at 348. In this case, too, the presence of federal regulatory interests should not serve to extinguish the state courts' power to adjudicate federal claims, particularly when questions of state law interpretation are involved.

## IV.

If, however, RECC's state court suit does trigger the sovereign immunity bar, then the district court should grant the government's petition for an injunction, for we believe that the government satisfies the other prongs of our injunctive relief analysis.[11]

■■■ *Irreparable Harm.* The district court found that the prospect of inconsistent state and federal court judgments did not constitute irreparable harm to the REA. In the private law context, RECC and the district court are surely correct in this regard. However, we read *Leiter* to say that when the government cannot participate in a state court suit, the prospect of inconsistent state and federal judgments is itself sufficient threat of irreparable harm to justify the issuance of an injunction. The Court wrote that injunctive relief was appropriate in that case because the parallel state court proceedings "could not settle the basic issue in the litigation and might well cause confusion if they resulted in a judgment inconsistent with that subsequently rendered by the federal court." 352 U.S. at 227, 77 S.Ct. at 291. The state court suit could not settle the basic issue in *Leiter,* because the issue was the government's ownership of mineral rights, and sovereign immunity prevented plaintiffs from joining the government in their state quiet title action. *See id.* at 226, 77 S.Ct. at 291. RECC contends that the prospect of inconsistent judgments is not of major consequence; it notes that the government will not be bound by res judicata if it does not intervene in the state court proceeding. Again, in the private law context, RECC is surely correct that absent deleterious res judicata consequences, inconsistent judgments do not necessarily amount to irreparable harm. But *Leiter* stands for the proposition that when the government requests an injunction against a state court suit in which it cannot participate, the

---

**10.** RECC's state court suit engenders such "preliminary doubts about local law." At first blush, it is far from clear that the dissenter's rights provision of IMCA, which has never been judicially construed, supports RECC's attempt to vitiate its power contract with WIPCO.

**11.** *See ante* at 432.

courts ought to attach greater importance to the possible inconvenience arising from inconsistent judgment tangles.[12] Therefore, if the district court finds that sovereign immunity bars the government's intervention in the state court proceeding, it should also find that the government has met its burden of showing irreparable injury.

*Balance of Irreparable Harms.* Here, too, we must disagree with the district court's analysis of the balance of harms factor. The court found that the potential harms to the United States and RECC were "roughly in equipoise." However, should an injunction issue against the state court suit, RECC would suffer only minimal harm. RECC would merely be required to litigate its claims in a different forum. Absent a substantive difference in the treatment RECC would receive in federal as opposed to state court, and absent a showing that RECC has already invested extraordinary resources in the state court litigation, we can identify no significant harm to RECC that would result from the issuance of an injunction. Assuming no adequate remedy at law, it follows from the fact that RECC would not be irreparably harmed by the grant of an injunction, and our conclusion that the REA *would* be irreparably harmed absent the issuance of an injunction, that the balance of harms in this case clearly favors the grant of injunctive relief.

■ *Reasonable Likelihood of Success on the Merits.* This prong of the injunctive relief analysis is not relevant to the consideration of motions for injunctive relief under *Leiter.* Normally, courts engaging in this segment of the analysis look to the merits of the substantive claims which attend a request for an injunction. In this case, however, as the district court aptly noted, the substantive claim *is* the request for an injunction under *Leiter.* That is, the government contends an injunction should issue not because the power contract might be voided in state court, but because of the very prospect of inconsistent state and federal judgments. As a result, the concept of "likelihood of success" has no meaning independent of whether the other prerequisites to the grant of injunctive relief have been satisfied.

■ *The Public Interest.* The district court suggested that this element was in "equipoise," as on the one hand, the government's interest in a federal forum is a public interest, whereas on the other, the public interest in "comity and federalism" counsels against the extinguishment of the state court proceeding. As our comments in the preceding sections amply indicate, this court is most sensitive to the federalism concerns that permeate this litigation. However, we do not believe that comity and federalism should be considered "public interest" factors that militate against the issuance of an injunction. These concerns are properly taken into account during the formulation of the legal rules that govern the award of equitable relief. For example, in shaping a rule that allows the federal courts under certain circumstances

---

12. The dissent contends that the government's inability to intervene in the state court suit was not relevant in *Leiter,* because the government itself conceded in its briefs in that case that it could have independently filed suit in state court. Respectfully, this misses the point. The relevant question in *Leiter* was not whether the government as a general matter could have availed itself of the state court forum, but whether it could have represented its interests in the state court proceedings already filed, in order to avoid being inconvenienced by a judgment to which it was not a party. The answer to *this* question was "no"—while the government could have separately *initiated* suit in state court, it could not have joined (as a party defendant) the suit already in progress which threatened to cloud its title.

We find the government's inability to represent its interests in state court to be of singular importance. Sovereign immunity considerations aside, when the government's regulatory interests are liable to be fettered by a judgment to which it cannot be a party, unfairness concerns are at their greatest. When, however, the government can represent its interests in a state forum competent to adjudicate its claims, we are hesitant to honor its request for removal absent statutory authorization. The government may choose to file independently in federal court, but if it does so, the resulting inconvenience of multiple judgments is of its own doing, and in any case, of a magnitude considerably less great than that resulting from being shut out of the state proceedings altogether.

to enjoin state court proceedings, the federal courts should consider the disrespect such a rule might show to the state courts. Writing for the Supreme Court in *Leiter*, Justice Frankfurter, a strong proponent of the role and competence of state courts in the federal system, apparently did just that. He concluded, however, that the issuance of an injunction comported with "healthy federal-state relations." 352 U.S. at 226, 77 S.Ct. at 291. Moreover, by reading *Leiter* to allow the issuance of injunctions only when the government cannot intervene in state court, we believe that we have shown due regard for comity and federalism concerns. Because the importance of these principles has already been reflected in the formulation of the substantive law applicable here, we do not believe that the district court should have considered them as independent public interest factors that weigh against the grant of an injunction. This leaves us with the district court's correct finding that the government's interest is in large part presumed to be the public's interest, and the government's assertion, with which we agree, that there is a strong public interest in not exposing the federal rural electrification program to adverse proceedings in which it cannot intervene.

### V.

"One case is enough," says the dissent, in response to our unwillingness to direct the district court to enjoin RECC's state court proceedings. We agree, in the abstract, that one case is surely better than two. The law, however, does not always provide for the most efficient result. Multiple judgment tangles are, to some extent, an unavoidable consequence of our system of dual judiciaries. Congress could easily eliminate the mess we face here by enacting more expansive removal statutes. Until it does, we believe there are limits to how expansively we can wield our equity powers in the name of efficiency. In the absence of congressional direction, we are hesitant to grant the government an exclusive federal forum in this case unless sovereign immunity precludes its intervention in state court.

The decision of the district court is therefore vacated and the case is remanded for further proceedings consistent with this opinion.

EASTERBROOK, Circuit Judge, concurring in part and dissenting in part.

Fallout from federal bailouts belongs in federal court. That is the judgment of Congress, reflected in the jurisdictional rules that govern litigation in the wake of bank failures. E.g., 12 U.S.C. § 1819(a) Fourth, as amended by § 209 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. 101–73, 103 Stat. 216. See also 12 U.S.C. § 1441a(a)(11), (*l*)(1), (*l*)(3), § 1730(k)(1), § 1818(i)(1); *FSLIC v. Ticktin*, 490 U.S. 82, 109 S.Ct. 1626, 104 L.Ed.2d 73 (1989). The Western Illinois Power Cooperative was not a bank, and the Rural Electrification Administration is not the Resolution Trust Corporation, but this is a bailout all the same. The REA guaranteed substantial indebtedness of WIPCO and Rural Electric Convenience Cooperative, one of its members; the Treasury has a substantial exposure, and the REA could have taken WIPCO over. As the price of forbearance, the REA insisted that WIPCO merge with Soyland, the equivalent of the "purchase and assumption" transaction that is the staple of the banking repertory. RECC wants to use this as the lever to escape its obligation to buy power—an obligation that (with similar obligations from other customers) is the financial base of the REA's loans. The requirements contract for power is to the REA as the bank's portfolio of loans is to the Resolution Trust Corporation and the FDIC. RECC understandably thinks its best shot of cancelling its obligations lies in state court; the REA understandably wants to be in federal court. As the dispute involves public rights, we ought not apply the common law standards that make it hard for private plaintiffs to obtain injunctive relief. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020 (7th Cir.1988); *FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir.1988); *SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir.1990). See also

Douglas Laycock, *The Death of the Irreparable Injury Rule*, 103 Harv.L.Rev. 687, 714–16 (1990), demonstrating that the prevention of multiple litigation is an exception to the traditional formula even in private cases.

That cases affecting the federal purse belong in federal court is the implication of the strings attached to consents that allow litigation against the United States. Usually one must sue the United States in federal court or not at all. E.g., 5 U.S.C. § 702 (waiving sovereign immunity in injunctive actions, but only in federal court); 28 U.S.C. § 2409a (allowing actions to quiet title in property in which the United States claims an interest other than a security interest, limited by 28 U.S.C. § 1402(d) to district court). When a statute allows litigation in state court, as 28 U.S.C. § 2410 does in some quiet title actions, the United States has a corresponding right to remove. See 28 U.S.C. § 1442. Indeed, there may be a general right of removal, encompassing this case, under 28 U.S.C. § 1441(c), which allows any suit that could have been filed in federal court to be removed to federal court even if only a single slice (the portion in which the United States defends its interest) is within federal jurisdiction. I therefore begin from a different perspective than do my colleagues. They observe that 28 U.S.C. § 1345, which allows the United States to sue, does not establish exclusive federal jurisdiction; I start with the fact that the Congress routinely assures the United States a federal forum when it allows or requires the government to litigate. There are exceptions, e.g., 43 U.S.C. § 666, the basis of *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976), but the norm supplies the perspective from which to assess the government's request for an injunction against the state litigation. When the case affects the fisc, "[i]t is altogether fitting that the sovereign should insist that such issues be decided by its own courts." Henry J. Friendly, *Federal Jurisdiction: A General View* 10 (1973).

If RECC's suit in state court were nothing but a mundane claim under the corporate law of Illinois, and the United States a curious observer, then the argument for an injunction would be weak. To gather the whole dispute into federal court would be to let the tail wag the dog at the expense of federalism. It might lead to an advisory opinion, avoidable if the state court construes state law in a particular way. From such a perspective it would be important for the district court to decide whether the REA plays a lead or a bit part in this imbroglio. I am satisfied that we know the answer to this question. The REA, thus the Treasury, is the star of this show.

Soyland and WIPCO merged at federal insistence. The REA demanded the merger to improve its chance of collecting a substantial debt. Soyland, WIPCO, and RECC all owe their size and scope (if not their existence) to federal loans and guarantees. Requirements contracts for power lie at the core of the program under the Rural Electrification Act. See *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Commission*, 461 U.S. 375, 103 S.Ct. 1905, 76 L.Ed.2d 1 (1983); *Wabash Valley Power Association, Inc. v. REA*, 903 F.2d 445 (7th Cir.1990). Electric cooperatives have little capital other than what the federal government furnishes (directly or through guarantees of private loans). Repayment depends on a steady income stream from the sale of electricity. Before it will make or guarantee a loan, the REA insists that the co-op have in hand contracts for the sale of power. Buyers promise to take their requirements from the REA's borrower, which prevents them from switching sources and leaving the borrower without means to repay. These contracts are subject to the REA's approval and cannot be cancelled without its consent. The buyers under the contracts also may be co-ops that borrow from the REA and so are *twice* bound: once as the customer of a G & T co-op, and once as borrower in their own right. Although it is conventional to say that the REA has a security interest in the contracts, it is more accurate to call the REA a third-party beneficiary, possessing the rights of a contracting party. It does not stand to collect

receivables after the fashion of a commercial factor; it was present at the creation of these contracts, and the other parties must meet its terms if they are to participate at all.

Involvement of this character means that federal rather than state law governs the validity of the contract. *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). If a bank fails and the FDIC or the RTC steps in, federal replaces state law; defenses available under state law vanish. E.g., *Langley v. FDIC*, 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 456, 62 S.Ct. 676, 679, 86 L.Ed. 956 (1942). Any suggestion that the domain of federal law is limited to obligations running directly to the United States was squelched in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–27, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979), which applied federal law to determine the priority among competing security interests in personal property, when a federal agency held one of the claims. It explained: "federal law governs questions involving the rights of the United States arising under nationwide federal programs." *Id.* at 726, 99 S.Ct. at 1457. That description fits our case neatly. Even the strongest supporters of federalism believe that courts should use national law to determine the rights and obligations of the national government. See Henry J. Friendly, *In Praise of Erie—and of the New Federal Common Law*, in *Benchmarks* 155, 178–85 (1967).

*Kimbell* reminded us that federal common law tracks state law, if the state law does not discriminate against federal interests. 440 U.S. at 727–33, 99 S.Ct. at 1457–61. Perhaps, then, Illinois law will govern this case indirectly. It will do this, however, only after a judge decides that uniform application of its principles will not undercut federal interests. I doubt that Illinois law could satisfy this standard if it creates an entitlement to break the requirements contract that was an essential condition of the federal loans, as opposed to creating only an entitlement to withdraw as a member of the merged entity. Section 1345 allows the United States to obtain from a federal court a decision on this question of federal law.

Whether or not state law applies, my colleagues' focus on the ability of the United States to intervene in the state case has something of the hypothetical about it. Even if it can intervene, it won't. Surely the REA has learned from *Wabash Valley* that if it intervenes it will be bound by the judgment, forfeiting any entitlement to the protection of federal court. 903 F.2d at 455. State judges, who must run for re-election, cannot fail to consider (if only subconsciously) that victory for RECC will mean lower electric rates locally, at some expense to taxpayers in 49 other states. Having been stung in *Wabash Valley*, the REA will ask the federal judge to engage in a race with the state judge, seeing who can careen to judgment faster. If Judge Mills disdains the contest, the REA will sit tight, knowing that nothing the state court does can preclude it. If RECC prevails in state court, the REA will ask Judge Mills for a second opinion. Federal oversight of state court judgments in this fashion poses more risks to values of federalism than does an initial federal decision. Worse still, the federal decision could benefit only the REA, for under the *Rooker–Feldman* doctrine and 28 U.S.C. § 1738 the federal court cannot alter the rights of the private parties. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923). The state's decision will bind Soyland, so a state-federal series creates the possibility of inconsistency that only the Supreme Court could resolve.

Is this risk necessary? Is the potential confusion essential? My colleagues say that the REA is entitled to an injunction against the state proceedings if and only if sovereign immunity precludes its intervention in state court. Whether sovereign immunity applies is a nice question; the majority does a good deal of massaging of the language in cases such as *United States v. Alabama*, 313 U.S. 274, 282, 61 S.Ct. 1011,

1014, 85 L.Ed. 1327 (1941) ("A proceeding against property in which the United States has an interest is a suit against the United States."), to give color to the possibility of a negative answer. I think the color is red (the species is herring) and so express no view on my colleagues' treatment of the subject. Even if the United States may intervene in state court, state and national interests are better served by quick decision in federal court.

*Leiter Minerals, Inc. v. United States,* 352 U.S. 220, 226–28, 77 S.Ct. 287, 291–92, 1 L.Ed.2d 267 (1957), provides ample support for this conclusion. Limiting *Leiter* to situations in which the United States cannot intervene in the state case is artificial. The United States argued in *Leiter* that sovereign immunity blocked intervention as a defendant but conceded that it could have filed its own suit: "The United States, of course, could have filed a separate and independent action, as plaintiff, in the Louisiana state court for Plaquemines Parish to have its title determined, but it did not choose to do this". Brief for the United States at 14–15, *Leiter Minerals, Inc. v. United States,* No. 26, October Term, 1956. A new suit could have been consolidated with the pending litigation, a maneuver no different in substance from intervention. Our superiors did not think the ease with which the United States could have put the dispute before the state court mattered. Why then should it matter to us? The Court discussed the possibility that the state action could be revamped even in the absence of the United States to avoid sovereign immunity but remarked: "nevertheless such proceedings could not settle the basic issue in the litigation and might well cause confusion if they resulted in a judgment inconsistent with that subsequently rendered by the federal court." 352 U.S. at 227, 77 S.Ct. at 291.

*Leiter* held the United States entitled to an injunction consolidating the litigation in federal court, where all parties could contest the issues. In *Colorado River,* when all parties were present in state court, the Supreme Court held that the litigation should continue there. There is a theme: one case is enough. Everyone is before a federal court, the tribunal most appropriate to the questions presented. So although I agree with the majority that the order denying injunctive relief cannot stand, I disagree with the terms of the remand. Instead of telling the district judge to determine whether sovereign immunity prevents the United States from intervening in state court—a question we could answer ourselves if it were relevant—we should tell the district court to issue the injunction and get on with the merits. It will have to decide the merits sooner or later and should do so sooner, avoiding wasteful duplication and eliminating all possibility of a clash between state and federal judgments.