UNITED STATES of America,
et al., Plaintiffs,

v.

RURAL ELECTRIC CONVENIENCE
COOPERATIVE CO., Defendant.

No. 89–3214.

United States District Court,
C.D. Illinois,
Springfield Division.

June 14, 1991.

J. William Roberts, U.S. Atty., Springfield, Ill., J. Christopher Kohn, U.S. Dept. of Justice, Civil Div., Michael W. Kelly, Helen Wyskoczka, U.S. Dept. of Agriculture, Washington, D.C., for plaintiff.

Adlai S. Hardin, Brent K. Olsson, Milbank Tweed Hadley & McCloy, New York City, Steven T. Berman, John J. List, National Rural Utilities Co-op., Finance Corp., Washington, D.C., for Nat. Rural Utilities Co-op. Finance Corp.

French L. Fraker, Dobbins Fraker Tennant Joy & Perlstein, Champaign, Ill., Forrest G. Keaton, Rammelkamp Bradney Dahman Kuster Keaton & Fritsche, Jacksonville, Ill., James E. Peckert, A. James Shafter, Kehart Shafter Hughes & Webber, PC, Decatur, Ill., for Soyland Power Co-op., Inc.

Daniel Lawler, Bell Boyd & Lloyd, Chicago, Ill., for Rural Elec. Convenience Co-op. Co.

## OPINION

RICHARD MILLS, District Judge:

A question of sovereign immunity.

This cause comes before the Court upon remand from the Seventh Circuit.

The circuit court vacated our prior decision denying the United States' motion for a preliminary injunction of a parallel state

court proceeding and remanded with instructions to determine "whether sovereign immunity precludes the government's intervention in the state court suit." *United States v. Rural Electric Convenience Cooperative Co.*, 922 F.2d 429, 434 (7th Cir. 1991).

Following receipt of the circuit court's mandate, we ordered the parties to file simultaneous briefs addressing the issues raised by the circuit court. Each party has also submitted a reply memorandum in response to the opposing brief. After fully considering the parties' filings, prior submissions, and the authority cited therein, we conclude that sovereign immunity does not preclude the government's intervention in the state court suit and thus the United States' motion for a preliminary injunction must be denied.

## I. Facts

The Rural Electrification Administration (REA) is a United States government lending agency within the Department of Agriculture which makes or guarantees loans to facilitate rural electrification. Congress provided statutory authorization for the REA in 1936. *See* Rural Electrification Act of 1936, 7 U.S.C. §§ 901–950b (1988). The loans are made on such terms and conditions as determined by the REA's Administrator. Pursuant to § 4 of the Act, the Administrator is required to find that the security for the loan is reasonably adequate. *Id.* § 904.

The REA makes loans to generation and transmission cooperatives (G & T's) as well as their member distribution cooperatives. At present, there are approximately 55 G & T's and 870 distribution cooperatives with a total outstanding loan amount in excess of $52 billion.

The borrowers generally have little equity in their physical assets. Therefore, in addition to taking a lien on the cooperative's physical assets, the Administrator requires the member distribution cooperatives to enter into long-term wholesale requirements contracts for the purchase of electricity from their G & T. These contracts constitute essential security for the loans and loan guarantees extended by the REA to the borrowers.

Rural Electric Convenience Cooperative Company (RECC) is a distribution cooperative operating in Illinois. Since 1957 the REA has been loaning money to RECC and as of March 31, 1991, the unpaid and outstanding principal amount of REA loans to RECC was $6,567,592.95.

In 1963, with the REA's approval, RECC entered into a wholesale power contract with the Western Illinois Power Cooperative (WIPCO), a G & T cooperative. Seven distribution cooperatives, including RECC, were members of WIPCO and promised to purchase electric power from WIPCO pursuant to the wholesale power contracts. RECC's contract with WIPCO, as amended, extends until 2017.

In 1989, WIPCO defaulted on its REA guaranteed loans. As a condition of restructuring WIPCO's debt, the REA required WIPCO to merge with Soyland Power Cooperative, Inc., a financially healthier G & T that was also a recipient of REA financing. The two cooperatives merged on March 23, 1989, leaving Soyland as the surviving corporation. As a result of the merger, Soyland succeeded to all of WIPCO's rights under the wholesale power contract with RECC and became liable for all of WIPCO's debts to REA. Currently, these loans aggregate over $1 billion.

As currently structured, Soyland is obligated to the REA on two separate notes. The "A" note is non-contingent and obligates Soyland to repay REA over $211 million. The "B" note, involving over $304 million, is contingent on Soyland being able to increase its total yearly sales of electricity to member distribution cooperatives (referred to as Soyland's "load"). Non-payment of amounts owing on the "A" note, as well as invalidity of the all-requirements contracts between Soyland and its member distribution cooperatives, constitute events of default under both the Mortgage and Debt Restructuring Agreement.

On June 15, 1989, RECC filed a complaint in the Circuit Court of Macon County, Illinois, seeking a declaratory judgment that RECC was discharged from its obli-

gations under the wholesale power contract with WIPCO pursuant to the Illinois Merger and Consolidation Act's dissenter's rights provisions. Ill.Rev.Stat. ch. 32, ¶ 188i (1989). *See Rural Electric Convenience Cooperative Co. v. Soyland Power Cooperative, Inc.,* No. 89–L–872.

In response to the state court suit, the REA, Soyland, and the National Rural Utilities Cooperative Finance Corporation (CFC), filed the instant action. These parties seek a declaratory judgment that the RECC–Soyland wholesale power contract is valid and binding, that RECC is in violation of its mortgage with the REA, and that RECC has unlawfully repudiated the wholesale power contract without REA's written consent in violation of the Rural Electrification Act.

The United States moves this Court for a preliminary injunction barring further prosecution of RECC's state court action. On January 18, 1990, we denied the Government's motion for a preliminary injunction on the ground, *inter alia,* that the United States could intervene in the state court action and thus had an adequate remedy at law precluding equitable relief.

On appeal, the circuit court vacated our decision denying the United States' motion for a preliminary injunction. The court held that, with the exception of establishing that it did not have an adequate remedy at law, the United States had established all of the elements necessary to obtain a preliminary injunction. Further, the court held that, if sovereign immunity precluded its intervention in the state court suit, the United States would not have an adequate remedy at law and the injunction should issue. The court remanded for a determination of whether sovereign immunity precludes the government's intervention in the state court suit.

## II. Analysis

■ The burden of establishing each element necessary for a preliminary injunction rests upon the moving party. *Roland Machinery Co. v. Dresser Indus.,* 749 F.2d 380, 386–87 (7th Cir.1984). Thus, the United States bears the burden of establishing that sovereign immunity precludes its intervention in the state court suit.

■ Sovereign immunity bars those suits that are "prosecuted against the United States." *Cohens v. Virginia,* 19 U.S. (6 Wheat.) 264, 5 L.Ed. 257 (1821). Whether or not a suit is against the sovereign depends upon whether the United States is "the real, substantial party in interest," in the litigation. *Pennhurst State School and Hosp. v. Halderman,* 465 U.S. 89, 101, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984).

In its opinion remanding this case, the circuit court stated:

> The general rule is that a suit is against the sovereign if "the judgment would expend itself on the public treasury or domain, or interfere with public administration," or if the effect of the judgment would be "to restrain the Government from acting or compel it to act."

*Dugan v. Rank,* 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963) (citations omitted). The United States argued before the circuit court that "a proceeding against property in which the United States has an interest is a suit against the United States." *United States v. Alabama,* 313 U.S. 274, 61 S.Ct. 1011, 85 L.Ed. 1327 (1941). The circuit court rejected such a blanket rule, distinguishing *Alabama* and similar cases on the ground that the "interests" referred to in those cases were ownership interests.

Rather, the circuit court stated that the determination of whether the Government's interest in the case was such as to make it a "real, substantial party in interest" must be determined on a case by case basis "by the essential nature and effect of the proceeding as it appears from the entire record." *Mine Safety Appliance Co. v. Forrestal,* 326 U.S. 371, 374, 66 S.Ct. 219, 221, 90 L.Ed. 140 (1945).

■ To answer the question of whether sovereign immunity bars the Government's intervention in the state court suit, we must determine to what extent extinguishment of the wholesale power contract and the Government's security interest therein threatens the ability of RECC and Soyland

to service their debt to the REA so as to cause a loss to the Government treasury. Also, we must determine whether a judgment in favor of RECC in the state court suit will impair the REA's regulatory mandate as might a coercive injunction.

## A. Loss to the Government's Treasury

A loss to the Government's treasury will only result if RECC or Soyland default on their loan payments. The United States has submitted no evidence that extinguishment of the wholesale power contract will impair RECC's ability to service its debt. In fact, presumably RECC wishes to avoid its obligation to purchase electric power from Soyland so that it can obtain an alternate source of power at a lower rate. Decreasing its overhead could only *improve* RECC's ability to service its debt.

RECC has submitted the affidavit of Gregory D. Wilson, one of RECC's directors and its Secretary and Treasurer since August, 1988. Mr. Wilson states that based upon his personal knowledge as a director and upon his examination of RECC's records, RECC has never been in arrears on a loan payment to either the REA or CFC. The United States has offered no evidence to dispute Mr. Wilson's affidavit regarding RECC's excellent record of debt service.

Based upon the foregoing facts, we conclude that RECC's success in the state court suit will in no way impair its ability to repay REA and thus potentially cause a loss to the Government's treasury.

In its initial and reply memoranda, the United States attempts to raise the specter that RECC's success in the state court suit will "devastate" the REA program in several respects. First, Soyland's ability to service its debt to the REA will be reduced by RECC's withdrawal thus leading to the collapse of the entire REA system costing the taxpayers over $52 billion. Second, termination of RECC's obligations under the wholesale power contract will result in an increase in the cost of electric power to rural consumers thus undermining the REA's ability to carry out the purposes of the Act. Third, RECC's success in the state court suit will allegedly jeopardize the REA's ability to utilize similar mergers in the future.

Turning to the REA's first argument, we must conclude that the United States has failed to present any specific evidence that RECC's success in the state court suit will impair Soyland's ability to service its debt sufficiently to impact the Government's treasury.

Logically the withdrawal of one out of 21 members of the Soyland cooperative will necessarily reduce Soyland's income by some amount. However, the United States has not presented any evidence regarding the relative contribution RECC makes to Soyland's income. If RECC's purchase of electric power from Soyland constitutes 50% of Soyland's income then RECC's withdrawal obviously will have a devastating impact upon Soyland's ability to service its debt. On the other hand, if RECC contributes less than 1% of Soyland's income, then its absence will likely have no effect on Soyland's debt service.

We could assume that RECC contributes 4.75% of Soyland's income based upon RECC being one of 21 member cooperatives. However, such an assumption would be pure speculation. It was the United States' burden to present sufficient, credible evidence to establish that RECC's withdrawal from the Soyland cooperative would impair Soyland's ability to service its debt to the point of impacting the Government's treasury. *Curtis v. Thompson*, 840 F.2d 1291, 1296 (7th Cir.1988). The United States has done nothing more than "say that it is so."

The United States makes a related argument concerning Soyland's obligation to make payments on the "B" note which is contingent upon an increase in Soyland's "load." However, the United States has not presented any evidence regarding Soyland's projected load growth, RECC's contribution to Soyland's load growth, or the potential effect of RECC's withdrawal upon Soyland's load growth.

As with RECC's contribution to Soyland's income, we can assume that RECC

makes some contribution to Soyland's load growth. How much is once again pure speculation because the United States has submitted no specific evidence.

The United States also argues that RECC's withdrawal will lead to a domino-effect whereby all the other distribution cooperatives will attempt to avoid their wholesale power contracts with Soyland. While we agree that if distribution cooperatives succeed in removing themselves from the REA structure in large enough numbers to precipitate default the costs will eventually be shifted to the American taxpayer, *Fuchs v. Rural Electric Convenience Cooperative, Inc.*, 858 F.2d 1210, 1212–13 n. 8 (7th Cir.1988), the United States admits that "[t]o date, no distribution borrower has successfully avoided its obligations under such a contract in litigation." Declaration of Larry A. Belluzo ¶ 20. *See, e.g., United States v. Southwestern Electric Cooperative, Inc.*, 869 F.2d 310 (7th Cir.1989) (distribution cooperative could not avoid obligation under wholesale power contract on the basis of mutual mistake or frustration of purpose); *Tri–State Generation and Transmission Association, Inc. v. Shoshone River Power, Inc.*, 874 F.2d 1346 (10th Cir.1989) (wholesale power contract contains an implied term prohibiting distribution cooperative from selling its assets to a private utility thus reducing its "requirements" to zero and terminating the contract).

It is also extremely speculative that RECC's success in the state court suit will result in the 20 remaining Soyland distribution cooperatives attempting to withdraw from the system. RECC was the only one of the seven WIPCO distribution cooperatives to assert its dissenter's rights pursuant to the Illinois Merger and Consolidation Act, Ill.Rev.Stat. ch. 32, ¶ 188i (1989). Thus, the basis upon which RECC seeks to avoid its obligations under the wholesale power contract is not available to WIPCO's six remaining distribution cooperatives nor to the 14 distribution cooperatives which originally comprised Soyland.

The REA's second argument is that termination of RECC's wholesale power contract will ultimately result in high rates to Soyland's consumers thus undermining REA's ability to carry out the purpose of the Act. This argument fails for the same reason that REA's first argument did. The United States has not submitted any evidence regarding the actual effect RECC's withdrawal will have on Soyland's financial structure. While we can still presume it will have some negative effect, how much is entirely speculative.

B. *Impairment of REA's Regulatory Mandate*

We were also directed by the circuit court to make a determination of whether "an adverse judgment will otherwise impair REA's regulatory mandate as might a coercive injunction." The REA argues that these wholesale power contracts are the linchpin of the entire rural electrification financing structure and that it relied upon the validity of the contracts in extending loans to RECC and WIPCO as well as in approving the merger of WIPCO and Soyland. Further, invalidity of the contract constitutes an event of default under the Debt Restructuring Agreement.

These arguments are unpersuasive. The Supreme Court cases holding that sovereign immunity bars a suit in which the plaintiff seeks coercive injunctive relief against the United States are distinguishable from the facts currently before us. In *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), a private corporation brought an action against the Administrator of the War Assets Administration, an agency of the United States, seeking an injunction prohibiting the Administrator from selling a load of surplus coal on the ground that plaintiff had already contracted with the Administrator to purchase the coal.

The Supreme Court concluded that the action of the Administrator was "inescapably the action of the United States and the effort to enjoin it must fail as an effort to enjoin the United States." *Id.* at 703, 69 S.Ct. at 1468. Noting that Congress was increasingly permitting suits against the United States to recover money damages,

the Court stated that it was "a far different matter to permit a court to exercise its compulsive powers to restrain the Government from acting, or to compel it to act." *Id.* at 704, 69 S.Ct. at 1468. The Court concluded that "[t]here are the strongest reasons of public policy for the rule that such relief cannot be had against the sovereign. The Government, as representative of the community as a whole, cannot be stopped in its tracks by any plaintiff who presents a disputed question of property or contract right." *Id.*

In *Dugan v. Rank*, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), certain claimants to water rights along the San Joaquin River below the Friant Dam in California brought suit against the United States and others seeking to enjoin the storing and diversion of water at the dam. The Supreme Court held that the injunctive relief sought by the plaintiffs would "force the abandonment of this portion of [the federal reclamation] project" and would "prevent the fulfillment of the contract made by the United States with the Water and Utility Districts...." *Id.* at 621, 83 S.Ct. at 1006. The Court concluded that the injunction would, indeed, "stop[ ] [the Government] in its tracks...." *Id.*

The REA has presented no evidence that an adverse decision in the state court suit will restrain the Government from acting or compel it to act. The United States argues that "if a state court rules that a distribution cooperative can avoid its contract, the value of the Government's security interest in all of such contracts will be diminished." However, as we stated above, the United States' concedes that no distribution cooperative has ever successfully avoided its contract obligations. Further, RECC's challenge in state court, based upon Illinois corporate law, is unique. The Government's broad speculation that an adverse ruling in state court will devastate the REA program is just that—speculation.

The United States also argues that if the state court rules in favor of RECC, mergers may no longer be a viable option for restructuring the debt of troubled power supply borrowers. Further, the United States argues that invalidity of the wholesale power contract constitutes an event of default under both the consolidated mortgage and the Debt Restructuring Agreement.

The United States was aware eight months before the merger of WIPCO and Soyland that RECC objected and would assert its dissenter's rights. In fact, RECC's litigiousness was the very reason the REA denied RECC a further loan of $1.4 million in July, 1988.

REA cannot now argue that it would have abandoned the idea of a merger if it was aware of RECC's challenge to the validity of the wholesale power contract and merger. In deciding to restructure a borrower's debt contingent upon the borrower merging with another corporation, the REA obviously must consider many factors. The fact that one of the borrower's distribution cooperatives may object to the merger is but one of them. This in no way will impact the REA's regulatory mandate "as might a coercive injunction."

### III. Conclusion

In conclusion, RECC's success in the state court suit will have no effect on RECC's ability to continue its debt service to the REA. While RECC's withdrawal from Soyland may have an impact on Soyland's ability to service its debt, the United States has submitted no evidence on the extent of any potential impact and thus we must find that any potential impact is both speculative and unsupported by the evidence. Further, RECC's success in state court will not impair the REA's regulatory mandate as would a coercive injunction. Therefore, we conclude that sovereign immunity does not preclude the United States' intervention in the state court suit.

*Ergo*, the United States' motion for a preliminary injunction (d/e 8) is DENIED.