**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Franco DANOVARO and Angel Rene
Leal, Defendants–Appellants.**

Nos. 87–1115, 87–1196.

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1989.

Decided June 14, 1989.

Rehearing and Rehearing En Banc in
No. 87–1196 Denied July 13, 1989.

Lewis Myers, Jr., Childs & Myers, Chicago, Ill., for defendant-appellant in No. 87–1115.

Albert D. Diamond, Miami, Fla., Sherman C. Magidson, John L. Sullivan, Chica-

go, Ill., for defendant-appellant in No. 87–1196.

Anton Valukas, U.S. Atty., David J. Stetler, Chief U.S. Atty., James R. Ferguson, Sheldon T. Zenner, Deputy U.S. Attys., Theodore T. Poulos, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

It must be hard to hire good help in the drug business. Angel Rene Leal dispatched Carlos Charry–Marquez from Miami to Chicago on November 8, 1985, to deliver four kilograms of Colombian cocaine to Carlos Alberto Gonzalez, the chieftain of a distribution organization. Carrying a black metal box, Charry checked into the Westin Hotel, where delivery was to be made. Charry concluded that he was being watched. (He was right.) Eluding his observers, Charry hid the box atop a ventilation duct in a room containing ice and vending machines on the seventh floor. The FBI caught him, but as he was "clean" they let him go; he fled. Instead of retrieving the box (risky given the surveillance, about which they had been warned), Gonzalez and Franco Danovaro marched through the halls of the Westin photographing each other, hoping to persuade Leal that they had done what they could. A similar stratagem failed miserably for the braggart Paroles in *All's Well That Ends Well*. After promising to retrieve a drum from the enemy's camp, Paroles lurked in the woods mulling over excuses and was "captured" by his own men. Gonzalez and Danovaro escaped with their photos, and the FBI got the cocaine—by accident. Maintenance workers found the box on November 12 and, not knowing what was inside, delivered it to the hotel's housekeeping office. The next day an agent, explaining to management why the FBI had been skulking about, spied the box on the lost-and-found shelves.

Gonzalez still needed cocaine to distribute, and Leal did not give up quickly on a major customer. Leal promised to send seven kilograms hidden in a truck's false gas tank. Danovaro and Edgar Jimenez drove the truck from Miami to Chicago, where it arrived during the early morning hours of November 24. Danovaro and Jimenez parked the truck in front of Juan Herrera's house and retired. The Chicago Police towed it away at about 6:00 a.m. because of a discrepancy between its license plate and its vehicle identification number. Herrera lamented to Gonzalez that he awoke just as the truck was departing. This was no burst of diligence in enforcing licensure rules; federal agents had asked the police for aid, and the truck was delivered to the FBI rather than to the auto pound.

■ Gonzalez knew that his supplier would not be amused by the loss of eleven kilograms of cocaine within two weeks; Leal, a bigger fish, had masters in Colombia to answer to. Who could have believed what actually happened? Leal's wife accused Gonzalez of lying (adding that the disappearance stood to cost the Leals $460,000), and Leal told Gonzalez that Gonzalez would have to explain himself to the Colombian suppliers. Leal insisted that Gonzalez send money; Gonzalez decided to send his wife to Miami to meet Arturo Martin, one of the Colombians. On November 26 Gonzalez's wife flew to Miami. On November 28 the FBI pounced. They arrested Gonzalez (carrying the photos from the Westin), Leal, and several others. Searches (authorized by warrants) of the homes of those involved in the network turned up drugs, records of drug transactions, and drug paraphernalia. The prosecutors also had in hand evidence of the delivery of four kilograms by Charry at the Westin on October 30, and oodles of phone records and tapes. Telephone records revealed that during the first seven months of 1985 Gonzalez made 300 phone calls to Colombia and 500 to Miami; a pen register during September and October 1985 recorded many calls to numbers in Colombia and Miami associated with the suppliers; a wiretap between October 17 and November 28 captured elaborate conversations (and excuses) among participants in the network. The affidavit supporting the application for the warrant

**586**

to overhear the conversations showed need within the meaning of 18 U.S.C. § 2518(1)(c). Other, less intrusive, investigative techniques had been tried without cracking the organization. Ordinary methods were unlikely to do so, the district court could find without committing clear error. *United States v. Zambrana*, 841 F.2d 1320, 1329–32 (7th Cir.1988); *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir.1976).

Gonzalez, Herrera, Jimenez, and two others pleaded guilty to various charges. Charry was arrested and released by mistake; he fled for a second time and is at large. The three Colombian suppliers were not nabbed. Five defendants stood trial. One was acquitted; two were convicted and did not appeal; Leal and Danovaro were convicted and appeal. Both were found guilty of conspiring to distribute cocaine, possession of cocaine with intent to distribute it, and using the telephone to facilitate drug transactions. Leal was convicted in addition of running a continuing criminal enterprise, in violation of 21 U.S.C. § 846. Leal was sentenced to 20 years' imprisonment (without possibility of parole), to be followed by five years' probation, and was fined $250,000. Danovaro was sentenced to 12 years' imprisonment plus four years' probation. A "special condition" of Leal's probation is that he leave the United States and never come back. Leal has not contested the district judge's authority to impose this condition.

■ The evidence was overpowering. Tapes, 11 kilos of cocaine, records and drug paraphernalia, fingerprints on evidence, telltale photographs, and more damned the defendants. Leal testified that he agreed to meet Martin and Gonzalez only to sell some kitchen equipment he had imported from Italy, and that Gonzalez had delivered $70,000 in cashier's checks only to pay for jewelry and repay a loan. Jurors were entitled to be skeptical. (The Treasury should be gratified that the shortage of $100 bills has driven dealers to leave a paper trail.)

■ Leal contends that two documents excluded under Fed.R.Crim.P. 16(d)(2)

would have bolstered his position that Gonzalez was paying a legitimate debt. One document purported to be a promissory note from Gonzalez for 237,000 Bolivars (about $50,000), the other was a receipt for jewelry. Although Leal had a year to prepare for trial, he did not tender these documents to the prosecution until the third week of trial, leading to their exclusion when the judge concluded that investigation of their authenticity would delay proceedings unduly. Although Leal insists that he had a good excuse—he is a native of Venezuela and these documents, he says, were with his family there—the judge was entitled to conclude that the delay was inexcusable. *United States v. Koopmans*, 757 F.2d 901, 906 (7th Cir.1985); cf. *Taylor v. Illinois*, 484 U.S. 400, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988). Leal's contention that the evidence on the CCE count was insufficient because he did not supervise five others also is unpersuasive; the record shows Leal as the orchestrator of large forces, even though he bought from dealers larger still. See *United States v. Bond*, 847 F.2d 1233 (7th Cir.1988) (CCE conviction of a middleman less responsible than Leal).

Danovaro complains only about the introduction of two items of evidence. (1) The prosecution proved that in September 1985 Miguel Rios, one of the defendants, sold 232 grams of cocaine to an undercover officer. Danovaro says that this is impermissible other-crimes evidence, which is wrong for two reasons: the sale was one of the overt acts alleged in the indictment, helping to demonstrate that Rios belonged to the distribution network, and it was not introduced against Danovaro. (2) Gelda Rios, Miguel's wife (and Danovaro's ex-wife), testified that Gonzalez delivered $15,500 to her, $10,500 to repay a debt and another $5,000 as child-support money on behalf of Danovaro. Rios was entitled to offer the former payment as part of his argument that an entry in Gonzalez's records reflected a debt unrelated to drugs, and the latter payment (at a time Danovaro claimed to have been unemployed) was legitimate evidence in the lists against him.

Evidence turned up on the authority of search warrants and the wiretap sealed Leal's fate, and his principal argument on appeal is that the district court denied him an adequate opportunity to challenge the affidavits supporting these warrants. He could not challenge them because he could not see their full texts. Having put into the affidavits information that they feared would reveal the identity of an informant, the prosecutors asked the district judge for permission to redact the affidavits before turning them over to Leal's counsel. Judge Duff allowed the prosecutors to do this, on condition that they file unexpurgated copies with the court and furnish defendants with an explanation of the kind of information that had been eliminated— transferring to criminal procedure the "*Vaughn* index" used in litigation under the Freedom of Information Act. *Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir.1973). Judge Duff then determined on the basis of an *in camera* inspection that the portions of the affidavits turned over to counsel, plus the description of the omitted portions, furnished an adequate basis on which to contest the warrants. On the merits, the district court concluded that the warrants were supported by probable cause and complied with the other requirements Title III of the Omnibus Crime Control and Safe Streets Act of 1968 imposes on wiretaps.

█ Leal contends that no court has allowed a prosecutor to withhold parts of an affidavit submitted in support of a warrant and asks us not to be the first. He fortifies his position with 18 U.S.C. § 2518(9), which makes evidence derived from wiretaps inadmissible unless ten days before trial each defendant "has been furnished with a copy of the court order, and accompanying application, under which the interception was authorized or approved." Affidavits submitted to the court are part of the "application" for the warrant. The prosecutor does not dispute any of this but rejoins: Safety first. Concern for the informant's life trumps the defendant's entitlements when the excised paragraphs could have been omitted from the affidavit in the first place without undermining the foundation of the warrant. Even if the defendant were to establish that the paragraphs in question were full of lies, the intercepted conversations nonetheless would be admissible if the remaining, truthful asseverations supported a warrant. *United States v. Johnston*, 876 F.2d 589 (7th Cir.1989); cf. *Franks v. Delaware*, 438 U.S. 154, 171–72 & n. 8, 98 S.Ct. 2674, 2684–85 & n. 8, 57 L.Ed.2d 667 (1978). We know from *Zambrana*, 841 F.2d at 1332– 35, that the affidavit may use codes such as "CI" in place of names. If the affidavit may hide important facts from issuing judge and defendant alike, it follows that the affidavit may supply information to the judge while withholding full disclosure from the defendant. Cf. *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

Codes may not be sufficient. Events may be as revealing as the informant's name. Details about five sales would allow the defendant to deduce the identity if only one person had been present at all five. Even innocuous details could let the cat out of the bag. And in the big-time drug business, to inform is to sign one's death warrant. So the author of the affidavit not only uses codes but also withholds details of the informant's observations. To withhold enough detail to assure the informant's safety may be to produce an insufficient warrant. Not necessarily because lack of detail defeats probable cause; *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), relieved much of the pressure on that score. Probable cause is not enough to get a warrant for a wiretap. The application must show that ordinary techniques are unlikely to suffice, see *United States v. Giordano*, 416 U.S. 505, 515, 94 S.Ct. 1820, 1826, 40 L.Ed.2d 341 (1974), and must disclose details about all persons expected to be overheard, *United States v. Donovan*, 429 U.S. 413, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). The statute requires the applicant to be exceptionally forthcoming, so that the judge may decide whether society's interests justify an exceptionally intrusive investigative device. To be forthcoming, to include enough that the judicial officer may choose intelligently,

is to put the informant's life at risk no matter how clever the coding.

As Leal sees things, the persons drafting the application and affidavit have two options: (1) they may withhold enough information to guarantee the informant's safety, but risk a decision denying the application (worse, an order suppressing the evidence at trial after the judge grants the application on an insufficient record); (2) they may include enough information to give the judge a clear view of the investigation and the need for the wiretap, and if in retrospect this disclosure is too much for the informant's safety, they may forego use of the interceptions at trial (or hope that the Witness Protection Program can secret the informant—an expensive and occasionally ineffectual expedient). We conclude that there is at least one more option: (3) the drafters may include in the affidavit facts they think would assist the court in deciding, then withhold from the defendant information that is both dangerous to the informant and unnecessary to sustain the warrant. That is, they may choose to defend their warrant without relying on the redacted information, just as they could forego reliance on information challenged as false and so avoid an adversary hearing into facts behind the application. Such a step hides less than using "CI" in the first place. It is not inconsistent with § 2518(9). Statutes requiring disclosure, but silent on the question of privilege, do not override customary privileges. *Upjohn Co. v. United States*, 449 U.S. 383, 397–98, 101 S.Ct. 677, 686–87, 66 L.Ed.2d 584 (1981). The privilege to withhold information important to the safety of an informant was established long before Congress enacted Title III. Although *Roviaro* is the usual citation for the privilege, it was recognized rather than established there. E.g., *In re Quarles & Butler*, 158 U.S. 532, 535–36, 15 S.Ct. 959, 960–61, 39 L.Ed. 1080 (1895); *Vogel v. Gruaz*, 110 U.S. 311, 316, 4 S.Ct. 12, 14, 28 L.Ed. 158 (1884).

The information excised in this case is not essential to support the warrants. What Leal saw was more than enough to establish probable cause and show that a wiretap was an appropriate investigative technique. Because we believe that these warrants are valid without regard to the concealed information, we need not decide whether there is a fourth option: to redact information that is both essential to the validity of the warrant and deadly to the informant, and rely on the prosecutor's summary of the redactions plus in camera inspection to test the adequacy of the affidavit.

The line between the third option (which we think fully protects the accused's rights) and the fourth (which we reserve for another day) is blurry, to be sure. We can imagine a case in which the excised information contains such damning evidence that it demonstrates the adequacy of conventional methods of investigation and thus the lack of need for a wiretap. *In camera* inspection thus serves an important role even when the prosecutor proposes to support the warrants on the basis of the public portions of the affidavits. Like the district judge, we have examined the deleted paragraphs and conclude that they do not undermine the warrant. Just as the prosecutor's summary of the omitted paragraphs says, these declarations tend to establish the reliability of the informant (they are principally concerned with other investigations) rather than showing how this conspiracy could have been brought down without a wiretap. Although we are conscious of the limits of *in camera* inspections—skepticism about the reliability of *ex parte* proceedings accounts for our reservation of what we have tagged the fourth option—such inspections play a legitimate role in the criminal process just as they have done under the Freedom of Information Act. *United States v. Kiser*, 716 F.2d 1268, 1270–74 (9th Cir.1983); *United States v. Southard*, 700 F.2d 1, 10–11 (1st Cir. 1983). See also Wayne R. LaFave, 1 *Search and Seizure* § 3.3(g) at 707–11 (2d ed. 1987).

■ Affidavits supporting three search warrants were withheld altogether from Leal rather than being turned over as abridged. The district judge allowed the prosecutor to squelch these affidavits because none of the searches in question took

place at premises in which Leal had a privacy interest. (One warrant authorized the search of a room at the Westin Hotel, a second permitted opening the black box, and the third entitled agents to search Gonzalez's apartment in Chicago.) Because evidence seized during these searches was admissible against Leal, see *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the district court held that he had no legitimate use for the affidavits. Leal now contends that this is wrong, that evidence seized from him may be "fruit of the poisonous tree", so that he is entitled to the instruments he needs to construct a challenge to the searches. We need not decide whether a defendant who cannot resist the introduction against him of evidence illegally seized from others could employ the illegality to interdict a derivative use. Leal did not present this argument to the district court. It is too late now, *United States v. Whaley*, 830 F.2d 1469, 1475–76 (7th Cir.1987), unless there is plain error—which there isn't.

■ One last subject and we are done. Gonzalez pleaded guilty in a proceeding closed to the public. Leal demanded a transcript of the plea, maintaining that it might contain something useful in his defense—either exculpatory information or guidance on whether he should call Gonzalez as a witness. Trials and pre-trial hearings are open to the public under the First Amendment, unless some extraordinary circumstance requires their closure. See *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 10, 106 S.Ct. 2735, 2741, 92 L.Ed.2d 1 (1986); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 508–10, 104 S.Ct. 819, 823–24, 78 L.Ed.2d 629 (1984); *Globe Newspaper Co. v. Superior Court*, 457, U.S. 596, 604–06, 102 S.Ct. 2613, 2618–20, 73 L.Ed.2d 248 (1982). Guilty pleas share some of the attributes of pre-trial proceedings and some of the attributes of trials. Cf. *United States v. Broce*, —— U.S. ——, 109 S.Ct. 757, 762–63, 102 L.Ed.2d 927 (1989). Public access to them reveals the basis on which society imposes punishment, especially valuable when the defendant pleads guilty while protesting innocence. See *North Carolina v. Alford*, 400 U.S. 25,

91 S.Ct. 160, 27 L.Ed.2d 162 (1970). As members of the public, Leal and his attorneys may attend proceedings at which pleas are taken and inspect the transcripts, unless there is strong justification for closing them.

■ We need not decide whether the proceedings at which Gonzalez pleaded guilty and was sentenced were properly closed. Leal does not demand access to the transcripts as a member of the public exercising rights under the First Amendment. Instead he wants us to reverse his convictions. *That* remedy is available only if lack of access to the transcripts hindered his defense. Judge Duff pored over the transcript and directed the prosecutor to disclose one exchange as potentially exculpatory material. He concluded, and we agree, that the transcript contains no other material even arguably within the scope of *Brady*. Gonzalez was available to Leal's counsel, who interviewed him before deciding not to call him as a witness; access to the transcript of the plea would not have added much if anything. Although Leal once more protests that *in camera* inspections deprive him of the wherewithal to contest the disposition, every demand for *Brady* material leaves counsel in the same position. The prosecutor need not turn over all files so that defense counsel may search out exculpatory material; counsel must be satisfied with the representations of the prosecutor, fortified by judicial inspection in close cases. *United States ex rel. Jones v. DeRobertis*, 766 F.2d 270, 274 (7th Cir.1985). As a source of exculpatory material, the transcript has yielded up its only nugget; as a source of information about Gonzalez's aptitude as a witness, the transcript duplicates information Leal had by other means. So even if we assume that the order closing the plea was erroneous, Leal's conviction is no less reliable.

AFFIRMED.