The **FORT WAYNE JOURNAL–GAZETTE, Craig Klugman, and Janice Karlovich, Plaintiffs,**

v.

**The Honorable Norman E. BAKER, and the Allen Superior Court, Defendants.**

**No. F 92–66.**

United States District Court,
N.D. Indiana,
Fort Wayne Division.

April 2, 1992.

Barrett & McNagny, James P. Fenton, Fort Wayne, Ind., for plaintiffs.

Beers, Mallers, Backs & Salin, G. William Fishering, Fort Wayne, Ind., for defendants.

Wilks & Kimbrough, John Wilks, Fort Wayne, Ind., for guardian Cheryl Murray.

## ORDER

WILLIAM C. LEE, District Judge.

This matter is before the court on motion of the plaintiffs, The Fort Wayne Journal–Gazette, Craig Klugman, and Janice Karlovich, (collectively, "the Journal–Gazette") for a preliminary injunction, filed March 26, 1992. The issues have been briefed by the Journal–Gazette. The defendants, the Honorable Norman E. Baker, and the Allen Superior Court have not filed responsive documents. On March 31, 1992, Cheryl J. Murray's motion to intervene in this action was granted. The court conducted hearings on the matter on March 31, and April 1, 1992. For the following reasons the Journal–Gazette's motion for preliminary injunction is GRANTED.

### Background

Cheryl J. Murray was appointed guardian for her 70 year old father, Raymond Murray, Sr., due to the father's incapacitation. This appointment was effected by order of the Allen Superior Court, in its Cause No. 02D02–9107–GU–133, on August 27, 1991. According to the Journal–Gazette's published report of March 14, 1992,[1] Mr. Murray is "a terminally ill patient" at Parkview Memorial Hospital ("Parkview"), who became comatose after unsuccessful "triple bypass surgery earlier this year."

On March 10, 1992, Parkview petitioned the Allen Superior Court for declaratory relief, or in the alternative, for removal of the guardian. Parkview's prayer for declaratory relief requested the Allen Superior Court to order that life support systems be withdrawn from Mr. Murray. Alternatively, Parkview requested that Cheryl Murray be removed as the guardian, in

---

1. Attached to the Journal–Gazette's complaint as "Exhibit E", and admitted into evidence.

favor of a successor who would make health care decisions for Mr. Murray. Furthermore, Parkview's petition requested the Allen Superior Court to enter a protective order covering their requested proceeding, due to the likely presentation of matters which would be subject to the physician-patient privilege. A hearing on Parkview's motion was set before Judge Baker for April 8, 1992.

A hearing to show cause as to Cheryl Murray's failure to file a guardianship inventory was set by the Allen Superior Court for March 23, 1992. On March 20, 1992, the guardianship inventory was filed with that court. On March 23, 1992, apparently at the request of Parkview, Judge Baker held some sort of a proceeding in the case.[2] That proceeding took place in Allen Superior Court courtroom number one, which was not locked to the public. At the outset of that proceeding, Judge Baker and the parties engaged in discussion which concluded with an agreement that the physician-patient privilege would not be abrogated by the fact of the testimony; additionally, Judge Baker ruled that the proceeding would be subject to a protective order. Judge Baker took inventory of all present in the courtroom, and commenced to take recorded, sworn testimony from at least one witness, that being Cheryl Murray. Cheryl Murray was not represented by counsel at that time.

At some point during the March 23 proceeding, plaintiff Janice Karlovich, a reporter for the Journal–Gazette entered the courtroom, took a seat in the front row of the spectator area, and commenced taking notes on her reporter's note pad. Apparently, Ms. Karlovich's presence was not detected, or at least, not complained of, until some time later, after Cheryl Murray completed her testimony.[3] During Ms. Karlovich's presence in that courtroom, Cheryl Murray stated that she had arrived at a decision regarding the future administration of life support for her father, and that barring reconsideration, this decision would become effective at a specified date, that date in the near future. While Ms. Karlovich was in that courtroom, Cheryl Murray revealed that date.

After that proceeding was concluded, Ms. Karlovich interviewed Cheryl Murray outside the courtroom. During this interview, Cheryl Murray confirmed that she had made the decision to withdraw life support from her father, but refused to confirm the effective date of this decision. Sometime later, Ms. Karlovich asked Catherine Ediger, counsel for Parkview, whether the protective order Judge Baker had granted that day would bar publication of the information Ms. Karlovich learned exclusively through the reporters' presence at the proceeding. Ms. Ediger judiciously responded by suggesting that Ms. Karlovich speak to the Journal–Gazette's attorney. Suspecting that the terms of the protective order would be of immediate interest to counsel for the Journal–Gazette, and knowing that Judge Baker had not reduced the protective order to writing by the end of the March 23 business day, Ms. Ediger prepared a form of protective order sometime that evening. Judge Baker subsequently signed that order at his home that

---

**2.** Counsel for Judge Baker and the Allen Superior Court describes that proceeding as "a settlement conference". This court finds it a curious practice where a settlement conference is conducted in an open courtroom, where witnesses give sworn testimony, and where the proceedings are transcribed.

Clearly, the protective order Judge Baker entered conclusively indicates that Judge Baker conducted a "hearing of March 23, 1992 in the above cause."

Judge Baker's minute entry in the cause for March 23, 1992 reflects only:

Guardian having filed Inventory, Show Cause hearing is cancelled. Petitioners Parkview Memorial Hospital and Dr. Edward Lelonek, by counsel, Catherine C. Ediger, request Protective Order. Request granted and Protective Order issued. (E.F.)

Furthermore, Journal–Gazette reporter Janice Karlovich testified in this court that after Cheryl Murray testified before Judge Baker, the Allen Superior Court Judge commented on Ms. Karlovich's presence. Ms. Karlovich added that Judge Baker then informed the parties that he would not be able to prevent Ms. Karlovich from publishing the information she learned in that "open court" proceeding.

**3.** See discussion regarding Judge Baker's comments on Ms. Karlovich's presence, at n. 2, *supra*.

**382**

night.[4] A copy of the order was then provided for the Journal–Gazette.

Journal–Gazette editor, plaintiff Craig Klugman testified before this court that the newspaper desired to publish information Ms. Karlovich acquired by her attendance at the March 23 hearing. Mr. Klugman further testified that the Journal–Gazette did not desire to risk contempt of court, unless it perceived no other alternative.[5] On March 24, 1992, the day following the Allen Superior Court hearing, the Journal–Gazette filed an emergency petition to intervene in the guardianship case, and also filed an emergency petition to set aside or modify the protective order. Judge Baker summarily denied these petitions that same day. On March 26, 1992, the Journal–Gazette commenced this action.

At this court's April 1, 1992 hearing on the preliminary injunction, the Journal–Gazette asserted that further efforts to have the Allen Superior Court's protective order reviewed in the state court would involve a further delay, which would extend well beyond the date that Cheryl Murray's decision to withdraw life support systems becomes effective. This assertion was not contested by counsel for Judge Baker or the Allen Superior Court.

### Abstention

■ A threshold matter of concern in this case is whether the court should entertain the Journal–Gazette's request for a preliminary injunction, due to the doctrine of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). "The basic principle of *Younger* abstention is that, absent extraordinary circumstances, a federal court should not interfere with pending state judicial proceedings. [This] doctrine has been extended to apply to civil proceedings in which 'important state interests' are involved." *Hickey v. Duffy*, 827 F.2d 234, 244 (7th Cir.1987); *citing Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 106 S.Ct. 2718, 2732, 91 L.Ed.2d 512 (1986). The policies underlying *Younger* abstention embrace the federal courts appreciation of:

> a proper respect for state functions, a recognition that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

*Middlesex Ethics Commission v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982). Therefore, this court is not eager to intervene in Allen Superior Court matters.

■ Courts have developed various tests which assist in the determination of whether a federal court should dismiss an action due to the concerns of federalism and comity as expressed in *Younger*. A recent Seventh Circuit case formulated this test:

> A court can abstain if the impacted state proceedings satisfy the following requirements: (1) the judicial or judicial-in-

**4.** That operative language of the protective order provides:

> COMES NOW the Petitioners herein, Parkview Memorial Hospital and Dr. Edward Lelonek, by counsel, Catherine Ediger, of Rothberg, Gallmeyer, Fruechtenicht, and Logan, and hereby requests a Protective Order as to the medical information relating to Raymond Murray, Sr. and all health care providers and that this privilege is and should be protected, and
>
> IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Petitioners' motion for a Protective Order is hereby granted and all documents, testimony, records, arguments of counsel, evidence received in the cause, and any other information, contained in the transcript of the hearing of March 23, 1992 in the above cause, of and concerning the medi-

cal care, treatment and condition of Raymond Murray, Sr., shall not be disclosed, discovered, published, discussed, or otherwise revealed by any person, firm, or corporation, in any manner whatsoever, except with respect to further proceedings in this cause and subject to further Orders of this Court.

**5.** Counsel for the Journal–Gazette stated that for purposes of the instant emergency preliminary injunction, the only information that the Journal–Gazette seeks to publish at the present time, which Ms. Karlovich learned form her attendance at the March 23 hearing, is the effective date of Cheryl Murray's decision regarding her father's life support systems. This isolated fact, that effective date, comprises the central focus of the instant litigation.

nature state proceedings are ongoing; (2) the proceedings implicate important state interests; and (3) there is an adequate opportunity in the state proceedings to raise constitutional challenges. *See Middlesex Ethics Commission,* 457 U.S. at 432, 102 S.Ct. at 2521.

*American Federation of State, County, and Mun. Employees v. Tristano,* 898 F.2d 1302, 1305 (7th Cir.1990). To invoke *Younger,* a federal court "must determine that both the relief sought and the ongoing state proceedings warrant the application of the" doctrine. *Tristano,* at 1305.

■ The importance of the state interest in a case may be demonstrated by the similarity between the state civil action at issue and criminal proceedings. *Middlesex Ethics Commission,* 457 U.S. at 432, 102 S.Ct. at 2521. However, the underlying Allen Superior Court guardianship case has very little similarity to criminal proceedings. The Allen Superior Court guardianship proceeding involved an entirely private dispute, to which the State of Indiana was not a party. Furthermore, the court must speculate as to what "important state interests" might possibly be implicated in the underlying Allen Superior Court proceedings, as none has been brought to the court's attention. In the court's appraisal, the sole conceivable state interest which might be affected is the state's interest in administration of its civil courts. However, the court agrees with the Fifth Circuit decision in *Henry v. First National Bank of Clarksdale,* 595 F.2d 291, (5th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980), wherein the *Younger* doctrine was not extended to civil litigation where the state interest, such as here, was no more than "an interest in providing and supervising state forums for the orderly resolution of private conflicts." *Henry,* at 301.

In reconciling whether the instant case is appropriate for application of the *Younger* doctrine, the court must also consider whether the Journal–Gazette had an adequate opportunity to raise its constitutional challenges in the state proceedings. The Journal–Gazette filed a motion to intervene in the state proceeding on March 24, 1992. This motion to intervene was summarily denied the same day it was filed.[6] Since the Journal–Gazette was not permitted to intervene in the relevant state proceeding, the procedures for appellate review in the Indiana courts appear inadequate to afford the Journal–Gazette a timely and meaningful opportunity to raise its First Amendment challenge.

### The Protective Order

More than two hundred years ago, our founding fathers declared, "Congress shall make no law ... abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble ..." U.S. Const. amend. I. This fundamental principle forms the essence of the Journal–Gazette's challenge to Judge Baker's protective order. This challenge presents the court with two distinct First Amendment issues. First, the Journal–Gazette asserts the right to publish information it has received—the right of publication. Second, the Journal–Gazette asserts the right to have been lawfully present at the Allen Superior Court hearing in the first instance—the right of courtroom access.

■ The right asserted in the first issue, the "right to publish or otherwise communicate information lawfully or unlawfully acquired", is accorded more protection than the second, the "right to acquire access" to information. *Press–Enterprise Co. v. Superior Court of California for Riverside County,* 478 U.S. 1, 18, 106 S.Ct. 2735,

6. The court expresses its disappointment with the Allen Superior Court's cursory treatment of the Journal–Gazette's motion to intervene. Due to the notions of federalism and comity, this court is loathe to become embroiled in matters such as guardianship, which are customarily outside of the province of the federal courts. Had the Journal–Gazette's motion to intervene been given thorough consideration by the Allen Superior Court, the protective order may have been reconsidered, and perhaps, the issue of publication of the relevant date could have been resolved without the necessity of invoking this court's jurisdiction. Such a result would have been preferable to the course of travelling the distance to the federal court, a route the Journal–Gazette felt compelled to traverse.

2745, 92 L.Ed.2d 1 (1986) (Stevens, J., dissenting). An order which prohibits the former—"an order which prohibits the publication or broadcast of particular information or commentary", is often designated an order imposing "prior restraint on speech." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 560, 96 S.Ct. 2791, 2801, 49 L.Ed.2d 683 (1976). Such "prior restraints on speech and publication are the most serious and least tolerable infringement on First Amendment rights." *Id.* 427 U.S. at 559, 96 S.Ct. at 2803. Prior restraints on speech are "presumptively unconstitutional", and a party seeking to defend such a restraint "carries a heavy burden of showing justification for the imposition of such a restraint." *Id.* 427 U.S. at 559, 96 S.Ct. at 2803.

In an action brought by another Indiana newspaper, the Seventh Circuit declared unconstitutional an Indiana state statute which criminalized publication of the names of persons against whom sealed indictments or informations had been filed. The court struck the statute as "an unconstitutional infringement of the First Amendment's guarantee of a free press." *Worrell Newspapers of Indiana, Inc. v. Westhafer*, 739 F.2d 1219, 1225 (7th Cir.1984), *aff'd mem.*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). In support of its ruling, the *Worrell Newspapers* court quoted the following passage from the Supreme Court's *Nebraska Press Ass'n* opinion:

> We have learned, and continue to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers. Regardless of how beneficient-sounding the purposes of controlling the press might be, we ... remain intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press.

*Worrell Newspapers*, at 1224; *Nebraska Press Ass'n*, 427 U.S. at 560, 96 S.Ct. at 2803.

The presumption favoring publication is further supported by the Supreme Court's opinion in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), where the court struck a Georgia statute which made it unlawful to publish the names of rape victims. There, Justice White explained that in the face of the First Amendment, the interests of privacy fade when the information involved appears on the public record:

> By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by there very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.

*Cox Broadcasting*, 420 U.S. at 495, 95 S.Ct. at 1046. Justice White cautioned that if there are privacy interests to be protected in the public record of judicial proceedings, public documentation and disclosure of the relevant information should be avoided. *Id.* 420 U.S. at 496, 95 S.Ct. at 1047.

Parkview chose to place the relevant information in the public domain when it filed its petition, describing Mr. Murray's condition as "terminal", and requesting, *inter alia*, that Judge Baker "make an order ... [finding] that health care administered to Raymond Murray is futile and must be withdrawn." Parkview further placed the relevant information in the public domain on March 23, 1992, by requesting the court take sworn, transcribed evidence from Cheryl Murray at what must be described as a court proceeding.

■ Despite the resourceful efforts of counsel for Judge Baker and the Allen Superior Court, the March 23 Allen Superior Court hearing cannot accurately be de-

scribed as a "settlement conference",[7] or as a discovery deposition.[8] Ms. Ediger, counsel for Parkview, states that Parkview invoked the aid of the state court "out of an abundance of caution." Even if some aspects of the relevant March 23, 1992 hearing resembled a reporting to the Allen Superior Court of the results of a "settlement conference", the peculiar facts of that March 23 hearing do not take that particular proceeding out of the public domain. The importance of Parkview's hauling the otherwise very private and difficult decision facing the Murrays into the public domain, cannot be understated. It is plain to this court that Parkview sought the implicit or explicit blessing of the state court in hospital action which might involve the withdrawal of life support from a hospital patient.[9] There exists no substantial reason for the relevant March 23, 1992 Allen Superior Court proceeding but for Parkview's desire for some type of court confirmation of Parkview's actions. Significantly, after the March 23 proceeding, the hearing on Parkview's petition, scheduled for April 8, 1992, was no longer necessary.

Pivotal to this court's decision in this matter is that the protective order entered by Judge Baker cited absolutely no justification for the imposition of the order, contrary to *Nebraska Press Ass'n*, 427 U.S. at 559, 96 S.Ct. at 2803. Thus, although the intentions of the Allen Superior Court in entering the protective order may have been laudable, that court erred when it failed to articulate facts which would warrant the presumptively unconstitutional prior restraint which it imposed.

The court now turns its attention to the second of the two identified First Amend-ment issues, the Journal–Gazette's asserted right to have been present at the Allen Superior Court hearing. In *Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1982), the Supreme Court announced, "the First Amendment guarantees of speech and press, standing alone, prohibit government from summarily closing the courtroom doors." *Id.* 448 U.S. at 576, 100 S.Ct. at 2827. And on the right of assembly, the same court observed, "a trial courtroom also is a place where the people generally—and representatives of the media—have a right to be present, and where their presence historically has been thought to enhance the integrity and quality of what takes place." *Id.* 448 U.S. at 578, 100 S.Ct. at 2828.

■ The public and press have a "presumption of access" to both criminal and civil court proceedings. *Matter of Continental Illinois Securities Litigation*, 732 F.2d 1302, 1308 (7th Cir.1984). The Seventh Circuit has remarked, "[t]rials and pre-trial hearings are open to the public under the First Amendment, unless some extraordinary circumstance requires their closure." *United States v. Danovaro*, 877 F.2d 583, 589 (7th Cir.1989); *citing Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986). The reasons for granting the public access to criminal proceedings apply with equal force to civil cases. *Matter of Continental Illinois*, at 1308.

Public knowledge and opportunity to criticize our governmental institutions are safeguards against abuse and mistrust in government. As Justice Brandeis observed nearly 60 years ago, "Sunlight is said to be

---

7. See the court's rejection of the "settlement conference" construction of the March 23 hearing, discussed at n. 2, *supra*.

8. Discovery matters may be subject to protective orders, if the standards of Indiana Trial Rule 26(C) (similar to the federal counterpart, Fed. R.Civ.P. 26(c)) are met. However, discovery matters are generally conducted in private, and were not open to the public at common law. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33, 104 S.Ct. 2199, 2207–2208, 81 L.Ed.2d 17 (1984).

9. The entire purpose of that proceeding was to obtain at least tacit approval of its conduct from the Allen Superior Court. As counsel for the Journal–Gazette points out, under Indiana law, both Judge Baker and attorney Solomon Lowenstein, Jr., the court-appointed Guardian Ad Litem, had an obligation to ensure that Mr. Murray's guardian not undertake any action contrary to Mr. Murray's best interest. If neither Judge Baker or Mr. Lowenstein objected to Cheryl Murray's proposed decision regarding the withdrawal of her father's health care, Parkview might infer the court's sanction of that decision.

the best of disinfectants; electric light the most efficient policeman." L. Brandeis, *Other People's Money*, 62 (1933). Similarly, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572, 100 S.Ct. at 2825; *Press–Enterprise Co.*, 478 U.S. at 10, 106 S.Ct. at 2742.

In *Richmond Newspapers*, a case concerning access to an underlying criminal proceeding, the Supreme Court held that the public has a First Amendment, freedom of speech, press, and assembly-based right to access to judicial proceedings. *Id.*, 448 U.S. at 564, 100 S.Ct. at 2820. There, the court announced that the right of access was not absolute. However, the court explained that before the right of access can be abrogated: "It must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607, 102 S.Ct. 2613, 2620, 73 L.Ed.2d 248 (1982). The court cautioned that factors which might override the right to access in favor of a protective order must be "articulated in findings." *Richmond Newspapers*, 448 U.S. at 581, 100 S.Ct. at 2829. Additionally, these findings must be sufficiently specific so as to permit a reviewing court to "determine whether the closure order was properly entered." *Press–Enterprise Co.*, 478 U.S. at 10, 106 S.Ct. at 2741.

Most examples of factors which may be considered in determining whether to favor a protective order which were enumerated by the court in *Richmond Newspapers* relate to criminal trials. However, some factors may apply here, such as, whether alternatives were considered to ensure fairness to the parties; and whether the constitutional right of access to the courts was recognized in the closure order. *Id.*, 448 U.S. at 581, 100 S.Ct. at 2829. A further examination of such relevant factors reveals that courts generally focus on matters which are cited as the basis for the rights to access to judicial proceedings (i.e., free speech, freedom of the press, public access, etc.) and on those matters which are cited as the basis for closure (i.e., attorney-client privilege, physician-patient privilege, fairness, etc.) *See, Continental Illinois, supra.*

As explained, *supra*, the Seventh Circuit has recognized "the presumption of access" with regard to the right of the public (and, therefore, the press) to attend both criminal and civil proceedings, and to obtain documents used in those cases. *Continental Illinois*, at 1308, (*citing* Justice Brennan's observation that public access to civil trials facilitates the accuracy of the fact finding process, in *Richmond Newspapers*, 448 U.S. at 596, 100 S.Ct. at 2838.)

In *Continental Illinois*, the Seventh Circuit held that the presumption of access applied to a pretrial "special litigation committee report" compiled in connection with a stockholder's derivative suit. In that case, because the trial court admitted that report into evidence, and because the trial court relied on the report in its disposition of the pending motion, the court of appeals permitted The Wall Street Journal and the Chicago Sun–Times access to copies of the report, despite a claim of confidentiality based on the attorney-client privilege. Notably, the court's holding was influenced by the fact that the materials at issue were dispositive of the underlying case. *Id.* at 1309.

The *Continental Illinois* court employed a "balancing test" to determine whether the interest in confidentiality created by the attorney-client privilege was outweighed by the "presumption of access". *Id.* at 1313. In applying this test, a court "must be firmly convinced that disclosure is inappropriate" before rejecting the presumption of access. *Id.* at 1313. Especially when granting a protective order, it is vital that the trial court state the basis for its ruling, so that a reviewing court can determine whether relevant factors were appropriately considered. *Id.* at 1313. In *Continental Illinois*, those competing factors included the public interest in open and fair forums for dispute resolution, and the free flow of information between client

and attorney. *Id.* at 1314.[10]

■ The facts of *Continental Illinois* approximate the case before this court, inasmuch as the information disclosed at the underlying hearings were claimed to be subject to privilege, and were directly relevant to the central issues of the cases. In the underlying Allen Superior Court case, the information disclosed is claimed to be subject to the physician-patient privilege, and was directly relevant to the resolution of the guardianship issue, which was being questioned by Parkview. In the instant case, it appears that the factors which might favor preservation of the physician-patient privilege are outweighed by those which favor the First Amendment disclosure.

Based on the broad language of the instant Allen Superior Court protective order, it is apparent that the protective order was not narrowly tailored. Furthermore, no compelling governmental interest was identified. The protective order lacked an articulated finding of factors which might have overridden the presumed right to access, and which might have favored the closure order. No extraordinary circumstance were identified which required closure of the Superior Court hearing. Therefore, the protective order offends the presumption of access to court proceedings, as guaranteed by the First Amendment.

### Preliminary Injunction

■ As the pending motion is one for a preliminary injunction, the court reviews the applicable standard for the issuance of such relief. In *Darryl H. v. Coler*, 801 F.2d 893 (7th Cir.1986), the Seventh Circuit detailed the analysis a district court must employ when considering a motion for a preliminary injunction. The district court must:

1. [ ] evaluate the traditional factors enumerated in the case law: whether there is an adequate remedy at law, the danger of irreparable harm, some likelihood of success on the merits.

2. [ ] make factual determinations on the basis of a fair interpretation of the evidence before the court.

3. [ ] draw legal conclusions in accord with the principled application of the law.

*Id.* at 898. Furthermore, that court added that the district court "must somehow balance the nature and degree of the plaintiff's injury, the likelihood of prevailing at trial, the possible injury to the defendant if the injunction is granted, and the wild card that is the public interest." *Id.* at 898.

Judge Posner articulated the Circuit's "sliding scale" approach to injunctive relief in terms of an algebraic formula in *American Hosp. Supply Corp. v. Hospital Products Limited*, 780 F.2d 589, 593–594 (7th Cir.1986). The "sliding scale" concept provides, essentially, that the district court should minimize the possibility of mistake by weighing the costs of injunctive relief against the benefits of the same. *Id.* at 593. More recently, in *United States v. Rural Electric Convenience Co-op. Co.*, 922 F.2d 429 (7th Cir.1991), the court restated the above analysis, declaring that the plaintiff seeking a preliminary injunction has the burden of establishing five factors: 1) no adequate remedy at law; 2) irreparable harm will ensue should the injunction not issue; 3) the irreparable harm which denial of the injunction will bring the plaintiff outweighs any irreparable harm that granting the injunction might cause the defendant; 4) a reasonable likelihood of prevailing on the merits; and 5) the injunction does not threaten the public interest. *Id.*, at 432.

In the present case, the resolution of the first of the five *American Hospital* factors clearly favors the Journal–Gazette: the Journal–Gazette has no adequate remedy at law. In this action, the Journal–Gazette simply has no party to sue for monetary damages.

As to the second factor, whether the Journal–Gazette will suffer irreparable harm should the injunction not issue, the

---

**10.** Furthermore, the *Continental Illinois* court noted that the lower court's defective protective order did not even meet the "good cause" standard for discovery protective orders of Fed. R.Civ.P. 26(c). *Id.* at 1311.

court determines that the harm to be suffered by the Journal–Gazette is the First Amendment-based loss of the ability to print the news of the effective date of the profound health care decision made by Cheryl Murray. This harm is irreparable: once the effective date passes without publication thereof, the value of the Journal–Gazette's knowledge of that date is lost.

Concerning the third factor, whether the irreparable harm which denial of the injunction will bring to Journal–Gazette outweighs any irreparable harm that granting the injunction might cause the Allen Superior Court, Judge Baker, or Cheryl Murray, the court applies the "sliding scale" in considering the impact of its decision. Denying the injunction risks the First Amendment rights of Journal–Gazette in providing the public with timely and consequential news about a troublesome issue of much public interest. The issue of providing health care for the terminally ill is passionately debated in our society. Obviously, granting the injunction risks further public exposure of a very private and solemn matter in the lives of the Murray family.[11] In contrast, the court does not perceive any significant risk to Judge Baker or the Allen Superior Court attendant to the granting of this motion. The court does not wish to slight the privacy concerns of the Murray's, however, the sliding scale tilts against that privacy interest, and in favor of the First Amendment. As Justice White explained in *Cox Broadcasting*, in the face of the First Amendment, the interests of privacy fade when the information involved appears on the public record. *Id.* 420 U.S. at 495, 95 S.Ct. at 1046. With regard to this factor, the court finds that in order to minimize the chance of being mistaken, the preliminary injunction must issue.

In considering factor number four, the Journal–Gazette's reasonable likelihood of prevailing on the merits, the court incorporates its discussion of these matters, as set forth, *supra*, and finds that this factor favors the Journal–Gazette.

As to the fifth factor, the "wild card that is the public interest", the court notes the prominence of the role that the First Amendment plays in protecting freedom in our democracy. Although perhaps obvious, sustaining that freedom is certainly in the public interest. Furthermore, the court again draws attention to the substantive nature of the underlying issue: Artificial life support for the terminally ill is a matter of intense public controversy. The media's ability to inform the general public of the role of the courts in providing or withdrawing health care for the terminally ill is clearly in the public interest.

In weighing these factors, the court finds the balance tilting in favor of the Journal–Gazette. The preliminary injunction will issue.

Concerning the requirement of security for the issuance of this preliminary injunction, Fed.R.Civ.P. 65(c) provides that security shall be "in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The court is aware of no monetary damages which might flow to the Allen Superior Court, Judge Baker, or Cheryl Murray as a result of this injunction. Therefore, no security is required.

### Conclusion

For the foregoing reasons, the Journal–Gazette's motion for a preliminary injunction against the Allen Superior Court and Judge Norman E. Baker, to prevent the Allen Superior Court and Judge Norman E. Baker from enforcing the protective order issued *In re Guardianship of Raymond Murray* on March 23, 1992, with respect to The Fort Wayne Journal–Gazette, Craig Klugman, Janice Karlovich, and all members of the public at large is GRANTED.

11. As discussed, *supra*, this public exposure would not have occurred but for Parkview's petition before the Allen Superior Court. Such intervention was ostensibly undertaken in the interest of Mr. Murray, but just as plausibly, the intervention may have been undertaken in the interest of Parkview Memorial Hospital.

Pursuant to Fed.R.Civ.P. 65(c), the court hereby ORDERS:

1.) The Allen Superior Court, Judge Norman E. Baker, and their officers, administrators, agents, employees, and all other persons acting in concert with them, are ENJOINED from enforcing the protective order issued by Judge Norman E. Baker on March 23, 1992, in Allen Superior Court Cause No. 02D02–9107–GU–133, captioned *In re Guardianship of Raymond Murray,* with respect to The Fort Wayne Journal–Gazette, Craig Klugman, Janice Karlovich, and all members of the public at large.

2.) The Journal–Gazette shall not be required to post any security with respect to the issuance of this Order.

3.) This preliminary injunction shall take effect immediately upon the time and date of its entry, and shall remain in effect until further Order of this court.